[Crim. No. 2045.   In Bank.—September 4, 1917.]

THE PEOPLE, Respondent, v. FREDERICK GRIESHEIMER, Appellant.

CRIMINAL LAW—FALSE PRETENSES—INDICTMENT OR INFORMATION—GENERAL DEMURRER—SUFFICIENT ALLEGATION OF PURPOSE FOR WHICH PROSECUTING WITNESS PARTED WITH PROPERTY.—An information for the crime of obtaining money under false pretenses, charging that the defendant falsely and fraudulently pretended and represented to the prosecuting witness that he was employed by the "Fatherland Magazine," a corporation, to solicit loans or subscriptions on its behalf and was authorized by it to receive and receipt for such loans and subscriptions, and that he had solicited and received certain specific contributions of money from certain German-American citizens, whose names and amounts of whose subscriptions were contained in a written list, which he falsely represented was

in the individual handwriting of the several subscribers, and also charging that the prosecuting witness, believing and relying on the truth of the said representations, was induced to deliver to the defendant the sum of three hundred dollars, but containing no direct allegation that the money was paid to the defendant as a subscription or loan to the "Fatherland Magazine," is good on appeal as against a general demurrer, in view of the provision of section 4½ of article VI of the California Constitution, that "no judgment shall be set aside, or new trial granted, in any case, . . . for any error as to any matter of pleading, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

ID.—FALSE PRETENSES—INSTRUCTIONS—SEVERAL DIFFERENT FALSE PRETENSES CHARGED.—Where an information charges several false pretenses, an instruction that a conviction may be had on proof of only one of such pretenses is good, when it is made clear to the jury that, in order to convict upon the ground that any particular representation was falsely and fraudulently made, they must be satisfied beyond a reasonable doubt that the particular representation was material in inducing the prosecuting witness to part with his money.

ID.—FALSE PRETENSES—SUFFICIENCY OF EVIDENCE.—Evidence reviewed and found to show clearly every essential element of the offense charged.

ID.—FALSE PRETENSES—DEFENDANT'S DISPOSITION OF THE PROPERTY FRAUDULENTLY OBTAINED IMMATERIAL.—The crime charged is complete when the defendant obtains the money on property as charged, and it is not necessary to show what he did with it, or that the money obtained was not in fact subsequently paid by him for the purpose for which he obtained it.

ID.—BURDEN OF PROOF—SUFFICIENCY OF INSTRUCTIONS—REFUSAL OF REQUESTED INSTRUCTION DIRECTED TO ONLY ONE OF SEVERAL MATERIAL ALLEGATIONS.—It was not error to refuse a requested instruction that the burden was on the prosecution to prove one particular specified alleged false representation when, from all the instructions given, the jury could not have understood otherwise than that the burden of proof was on the prosecution, as to all the material allegations of the information, and there was nothing in the case to make imperative the giving an instruction directed specially to one of such allegations.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.   Geo. H. Cabaniss, Judge.

The facts are stated in the opinion of the court.

Rothchild, Golden & Rothchild, and Oliver Dibble, for Appellant.

U. S. Webb, Attorney-General, John H. Riordan, Deputy Attorney-General, C. M. Fickert, District Attorney of the City and County of San Francisco, and James F. Brennan, Assistant District Attorney, for Respondent.

ANGELLOTTI, C. J.—The defendant was convicted of the crime of obtaining money by false pretenses under section 532 of the Penal Code, and prosecutes this appeal from the judgment and from an order denying a new trial.

1. It is claimed by the appellant in support of this appeal that his general demurrer to the information should have been sustained. The charging part of the information is as follows:

"The said Frederick Griesheimer on or about the 25th day of May, A. D. nineteen hundred and fifteen, at the said City and County of San Francisco, State of California, then and there devising and intending by unlawful ways and means, and by false and fraudulent pretenses and representations to obtain and get into his possession the goods, money and personal property of one Karl Muck with intent then and there to cheat and defraud the said Karl Muck of the same, did then and there willfully and unlawfully, knowingly and designedly, falsely and fraudulently, pretend and represent to said Karl Muck that he, the said Frederick Griesheimer, was then and there employed by the 'Fatherland Magazine,' a corporation, organized and existing under and by virtue of the laws of the State of New York, and that he, the said Frederick Griesheimer, was then and there authorized, empowered and instructed by said corporation to solicit loans and subscriptions on behalf of said corporation and that he, the said Frederick Griesheimer, was then and there authorized and empowered by said corporation to receive and receipt for said subscriptions and loans for and on behalf of the said corporation, and that he, the said Frederick Griesheimer, had then and there solicited and received several, specific and distinct contributions of money from the following German-American citizens of the City and County of San Francisco, State of California, to wit: that N. Ohlandt of San Francisco, California, had subscribed for and paid to him, the said Frederick Griesheimer,

one hundred and fifty (150) dollars in lawful money of the United States of America, for and on behalf of said corporation; that E. L. Hueter of San Francisco, California, had subscribed for and paid to him, said Frederick Griesheimer, the sum of three hundred (300) dollars in lawful money of the United States of America, for and on behalf of the said corporation; that C. E. Grunsky of San Francisco, California, had subscribed for and paid to him, the said Frederick Griesheimer, the sum of three hundred (300) dollars in lawful money of the United States of America, for and on behalf of said corporation; that Max Schmidt of San Francisco, California, had subscribed for and paid said Frederick Griesheimer, the sum of seventy-five (75) dollars in lawful money of the United States of America, for and on behalf of said corporation, and the said Frederick Griesheimer did then and there show and exhibit to said Karl Muck, a certain written list which said Frederick Griesheimer then and there represented contained the names of each of said parties so subscribing together with the amounts subscribed by each written in the individual handwriting of each of the said parties so subscribing respectively.

"Whereas, in truth and in fact, he, the said Frederick Griesheimer, was not then and there employed by the said 'Fatherland Magazine,' a corporation, organized and existing under and by virtue of the laws of the State of New York, and he, the said Frederick Griesheimer, was not then or there authorized, empowered or instructed, by said corporation to solicit loans or subscriptions on behalf of said corporation, and he, the said Frederick Griesheimer, was not then or there authorized or empowered by said corporation to receive or receipt for any subscription or loans for or on behalf of said corporation, and he, the said Frederick Griesheimer, had not then or there solicited or received the several and distinct contributions of money from said German-American citizens of San Francisco, California, as said Frederick Griesheimer then and there represented to said Karl Muck; that N. Ohlandt of San Francisco, California, had not subscribed for or paid to him, the said Frederick Griesheimer, the sum of one hundred and fifty (150) dollars in lawful money of the United States of America, or any sum in excess of fifty (50) dollars for or on behalf of said corporation; that E. L. Hueter of San Francisco, California, had not subscribed or paid to him,

the said Frederick Griesheimer, the sum of three hundred (300) dollars in lawful money of the United States of America or any sum in excess of twenty (20) dollars for or on behalf of said corporation; that C. E. Grunsky of San Francisco, California, had not subscribed for or paid to him, the said Frederick Griesheimer, the sum of three hundred (300) dollars in lawful money of the United States of America or any other sum of money whatsoever for or on behalf of said corporation; that Max Schmidt of San Francisco, California, had not subscribed for or paid to him, the said Frederick Griesheimer, the sum of seventy-five (75) dollars in lawful money of the United States of America, or any other sum for or on behalf of said corporation; that said written list which said Frederick Griesheimer showed and exhibited to said Karl Muck, as aforesaid, was not signed by either said Max Schmidt or said C. E. Grunsky and the amount and amounts as shown on said list as being subscribed by said N. Ohlandt and said E. L. Hueter were false and fraudulent and he, the said Frederick Griesheimer, did not have any authority whatsoever then or there or at any time to solicit subscriptions for said corporation or to solicit loans for said corporation, and had not authority of any kind or description from said corporation, as he, the said Frederick Griesheimer, then and there well knew:

"And the said Karl Muck then and there believing the said false pretenses and representations so made as aforesaid by the said Frederick Griesheimer, to be true and relying thereon and being deceived thereby was induced by reason of said false and fraudulent pretenses and representations so made as aforesaid to deliver, and did then and there deliver to said Frederick Griesheimer the sum of three hundred (300) dollars in lawful money of the United States of America of the value of three hundred (300) dollars in gold coin of the United States of America and of the goods and personal property and moneys of the said Karl Muck; and the said Frederick Griesheimer then and there by means of the said false and fraudulent pretenses and representations so made as aforesaid, did then and there willfully and unlawfully, knowingly and designedly and fraudulently receive and obtain from the said Karl Muck the said goods and personal property and money hereinbefore described with intent to cheat and defraud Karl Muck of the same, and the said Frederick Griesheimer did

then and there willfully and unlawfully take and carry away the same.''

The particular defect in this information, as urged by appellant, is that it does not show the causal connection between the false pretense and the parting with the property by the prosecuting witness, and therefore fails to state facts sufficient to constitute a public offense.

We are of the opinion that as against the defendant's general demurrer the information should be held sufficient on appeal. While there is no direct allegation that the money was paid to the defendant as a subscription or loan to the ''Fatherland Magazine,'' a reader of the information could hardly draw from it any other inference than that the payment was made for such purpose. It may be conceded that a direct allegation to this effect would have been more in accord with technical requirements. But what was intended to be charged in this connection is perfectly plain from the language in fact used, and no person of common understanding could fail to understand that it was substantially charged, by necessary inference at least, that the money was paid because of the alleged false representations, and for the purpose suggested thereby. Section $4\frac{1}{2}$, article VI, of the Constitution provides that ''no judgment shall be set aside, or new trial granted, in any case, . . . for any error as to any matter of pleading, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'' We are satisfied that to reverse the judgment on this ground would be to entirely ignore this provision of our Constitution.

2. Complaint is made as to a certain instruction given to the jury. The court instructed the jury as follows:

''In a case of this kind there can be no actual fraud, and there can be no criminal offense, unless the prosecuting witness was actually defrauded; or, in other words, unless the prosecuting witness sustained an actual injury from the alleged false representations. It is not sufficient that the prosecuting witness parted with his money by reason of the alleged false representations, but it must also be proved and established, beyond all reasonable doubt and to a moral certainty, that the prosecuting witness actually sustained a money injury by reason of the same.

"As an amplification of that instruction, and with a view, perhaps, to further and better explain the doctrine which it announces, I will say to you that if a list purporting to contain the names of subscribers to any fund, whatsoever may be its character, is exhibited to another person with a view of inducing him also to subscribe for the fund, and false statements are made as to the giving of subscriptions by some of those whose names are written down upon the fund list, and if misrepresentations are made as to amounts actually subscribed or contributed by some of those whose names are written down upon the fund list, and the party making those misrepresentations knows, at the time he makes them, that they are false, and makes them with intent to thereby prevail upon or induce the party to whom they are made to subscribe money to the fund and to deliver money over to him to be applied to the fund or purpose, and if, as a matter of fact, those statements made under those circumstances are, by the party to whom they are made, believed to be true, and if he by reason of that fact—namely, his belief in the truth of the representations— subscribes toward the fund and actually pays over money to be applied to it, and he is induced so to do, I think I have already stated, by reason of the misrepresentations made under those circumstances—the party so making those misrepresentations would, as a matter of law, be guilty of the offense of obtaining money under false pretenses.

"In order to constitute the offense of obtaining money or property by false or fraudulent representations, or pretenses, four separate and distinct things must concur: First, there must be an actual fraud committed; second, false pretenses must be used for the purpose of perpetrating the fraud; third, the fraud must be accomplished by means of the false pretenses, and the false pretenses must be made use of for that purpose, and the false pretenses must be the cause which induced the owner to part with his money or property; fourth, there must be an intent to defraud; and where one is charged with the commission of such crime, before he can be convicted, you must find, beyond a reasonable doubt and to a moral certainty, that each and all of such elements existed and concurred. . . .

"If you find that some of the alleged false representations set forth in the information—one or more, but not all—have

been established to a moral certainty and beyond all reasonable doubt, and further find, to a moral certainty and beyond all reasonable doubt, that the complaining witness was induced, by reason of his belief in the existence of one or several of the alleged false representations, and he was by reason of his belief in their existence induced to part with his money—you would in that case adjudge the defendant guilty, provided you so find, of course, to a moral certainty and beyond all reasonable doubt.

"If you entertain any reasonable doubt as to whether any one of those false representations has been established to a moral certainty and beyond all reasonable doubt, or if you entertain any reasonable doubt as to whether—assuming that you do find false representations to have been made; if you entertain any reasonable doubt as to whether they, or any one of them or any several of them, caused or induced the complaining witness to part with his money—why, of course, in that case also it would be your duty to return in the case a verdict of not guilty.

"  . . . And I think I have made it clear to you, and will again undertake to state the proposition, that, if there be any one false pretense or representation of the several charged in the information, which you find, to a moral certainty and beyond all reasonable doubt, to have been made by the defendant, and which one misrepresentation you further find, to a moral certainty and beyond all reasonable doubt, caused or induced the complaining witness to part with his money—why, that would meet every requirement of the law quite as much as if each and every one of the false pretenses or representations so charged were shown to exist, and so shown to a moral certainty and beyond all reasonable doubt."

It is earnestly urged that the particular instruction commencing with the words, "As an amplification of that instruction," is erroneous, in that it directs a conviction on proof of the falsity of only one of the alleged representations as to the amounts subscribed by the various persons whose names appeared on the list shown Mr. Muck, even though the jury was not satisfied that the particular representation was a material inducement to Mr. Muck's subscription. Of course, it is admitted that where an information charges several false pretenses a conviction may be had and will be sus-

tained by proof of only one of such pretenses, provided it be established to the satisfaction of the jury that the particular pretense proved was material in inducing the complaining witness to part with his property. It requires a somewhat critical and technical analysis of the particular instruction complained of to find anything therein in conflict with this well-settled law, and we are satisfied that in view of all that was said by the court to the jury in this immediate connection that no such effect as is claimed could reasonably have been attributed by the jury to the instruction. Reading the instructions on this subject as we have set them forth, it is plain enough that it was made perfectly clear to the jury that in order to convict upon the ground that any particular representation was falsely and fraudulently made, they must be satisfied beyond all reasonable doubt that the particular representation was material in inducing Mr. Muck to part with his money.

3. As to the claim of insufficiency of evidence: We have carefully considered the record and feel warranted in asserting that any jury of reasonable and fair men could not but be convinced by the evidence beyond all reasonable doubt of the guilt of the defendant of the offense charged, in so far as the representation that he was employed by "The Fatherland" publishing company and authorized to solicit loans and subscriptions on behalf thereof was concerned, which it clearly enough appears, was an effective representation inducing the parting with his money by Muck. This transaction was at a time prior to the entry of the United States into the war in which we are now engaged, and the "Fatherland" was supposed to be engaged in creating sentiment in this country in favor of Germany as against the allies. Such was the purpose of the requested assistance as outlined in the purported authorization exhibited by defendant to Muck, and the latter, as a strong sympathizer with the cause of Germany, was an easy victim to the scheme of defendant. That this representation had a controlling effect with him indisputably appears from his testimony. Much reliance is placed upon the fact that no direct evidence was introduced showing that the purported written authorization to one "Henry M. Meyers," bearing date April 2, 1915, which was exhibited to Mr. Muck on May 21st by this defendant, as his credentials, he claiming to be Meyers, was not a genuine instrument. Under the cir-

cumstances such evidence was not essential. The falsity of the representation as to authority was otherwise sufficiently shown to satisfy beyond all reasonable doubt any fair juror. Admittedly the purported telegram of May 24, 1915, from ''The Fatherland'' to ''Meyers and Schmidt, Special Representative 'Fatherland Magazine,' '' exhibited by defendant as Meyers to Muck on May 25th, implying authority in every line, and on the strength of which the last two hundred dollars of the three hundred dollars was obtained from Muck on that day, was an absolute forgery concocted by defendant. This particular transaction, the obtaining of the two hundred dollars on May 25th, was the one on which the district attorney elected to rely. This, together with other facts and circumstances disclosed by the evidence, amply showed the falsity of the representation as to authority. There is no force in the claim that the three hundred dollars was not obtained by defendant. The evidence sufficiently shows that the checks on a Boston bank given by Muck to defendant, after being cashed by defendant at the Fairmont Hotel office, were forwarded in due course of business to the drawee bank and never repudiated. In fact, we are satisfied, as already stated, that every essential element of the offense is clearly and absolutely shown by the evidence, and that, in view of the record, there can be no doubt of the guilt of the defendant.

4. It is urged that it was not affirmatively shown that the money obtained by defendant was not in fact subsequently paid by him to ''The Fatherland.'' Without this proof it is urged there is no proof of injury to Muck. The crime charged against this defendant was complete upon his obtaining the money from Muck by false and fraudulent representations, and it was not necessary to show what defendant did with it. (See *People* v. *Bryant*, 119 Cal. 597, [51 Pac. 960].)

5. It cannot be held to have been error warranting reversal for the court to refuse to give the requested instruction as to the burden of proof being on the prosecution to prove beyond all reasonable doubt the alleged false representation that defendant was authorized to collect moneys for ''The Fatherland.'' The jury could not have understood otherwise from all the instructions given than that such was the situation as to each and all of the material allegations of the information, and there was nothing in this case to make imperative the

giving of such an instruction directed specially to one of such allegations.

We find no other point in the briefs of learned counsel that requires notice. We may properly say in conclusion that in our opinion the record shows no error substantially affecting defendant's rights, and that it undoubtedly shows his guilt of the offense charged. This case falls as clearly within the provisions of section 4½, article VI, of the Constitution as any case that has ever been presented to us.

The judgment and order denying a new trial are affirmed.

Shaw, J., Sloss, J., and Lawlor, J., concurred.

HENSHAW, J., Dissenting.—I dissent. In the opinion of the learned chief justice three main propositions are discussed. The first, the sufficiency of the indictment; the second, the legality of the instructions; the third, the adequacy of the evidence. As to each of these propositions it is demonstrably true that this court's decision is at variance with that of every other court which makes the English common law the basis of its jurisprudence. But even for this I would not feel impelled to express my dissenting views at length saving for the additional fact that section 4½ of article VI of our Constitution is employed, like the mantle of charity, to cover this multitude of sins. It is against this entirely unwarranted extension of the provision of this section of the Constitution that I am moved to protest.

1. The sufficiency of the indictment. It is to be noted and remembered that the indictment does not charge that Karl Muck gave his money to the "Fatherland Magazine," or that he gave it to defendant for the "Fatherland Magazine." On the contrary, it is distinctly charged that he gave it to the defendant. The profession is advised by the learned chief justice that "a reader of the information could hardly draw from it any other inference than that the payment was made for such purpose" (that is, to be delivered to the "Fatherland Magazine"), and, further, that "no person of common understanding could fail to understand that it was substantially charged by necessary inference at least, that the money was paid because of the alleged false representations, and for the purpose suggested thereby" (namely, to be delivered to the "Fatherland Magazine"). To this I make answer that

direct averments are required in every indictment and information, and the only inferences which can be drawn are those which the law itself draws, such as the presumption that a defendant intends the consequences of his act; that he has passed his nonage and is therefore accountable for his acts; and that he is sane and therefore responsible for his acts. Such, and such inferences alone, does the law permit. Juries *in weighing the evidence* may draw inferences if reasonably deducible from the evidence, but I take it that this is the first time in the history of criminal pleading that inferences have been indulged in to make good an indictment otherwise lacking in averment, and that such inferences are indulged against the direct allegation of the indictment. Generally, as has been said, inferences to make out the *charge* of crime are not permissible, for two most obvious and oft-repeated reasons. The first, because every inference to be drawn shall be one of fair dealing and not of guilt, the second, because the presumption of innocence countervails against all other inferences or presumptions *until the proofs establish the contrary.* Second, we have not the omission of an allegation in this indictment. We have the direct allegation that the money was given to the defendant, and this, by inference, is distorted to mean what is not alleged, that it was given to the defendant as the agent, for transmission to the "Fatherland Magazine." Again, even if such an inference could be indulged as against the express allegation to the contrary, it becomes necessary, as a matter of good pleading, to charge that in fact this money was not so delivered by the defendant to the "Fatherland Magazine," or there has been a failure to state the crime, and this is not done. Still further we have an indictment which the defendant, under every rule and principle of law, is entitled to take at its face value. So taking it, the indictment charges in terms that by reason of certain false misrepresentations, Karl Muck gave the defendant three hundred dollars. There is an absolute failure to show the causal connection between the allegations of false representations and the allegation of payment of money, and in any such indictment it is only where the payment follows inevitably and as matter of necessary consequence from the allegations of false representation that the omission so to charge that causal connection does not constitute a fatal defect in the indictment.

The rules of pleading of actual fraud in a criminal case are certainly no more relaxed than the rules which obtain in pleading the same fraud in a civil case, and, if anything, should be the more stringently applied where a man is put on trial for a crime. (*People* v. *McKenna,* 81 Cal. 158, [22 Pac. 488].) But to make clear my meaning beyond peradventure, let those rules here be briefly summarized. The acts constituting the fraud must be sufficiently set forth. It must be charged that these acts, of speech or conduct, were uttered and done with intent to deceive; that the plaintiff or person injured relied on them and was justified in his reliance on them; that they were false and either known to be false at the time the defendant committed them, or were said and done under circumstances not warranted by the knowledge of the defendant; and, finally, that because of his justified reliance upon these statements and acts the plaintiff, or person injured, parted with money or property when otherwise he would not have done so. (*People* v. *Jordan,* 66 Cal. 10, [56 Am. Rep. 73, 4 Pac. 773].)

It is manifest, therefore, that the connection between the fraudulent acts by the one and the parting with money or property by the other must appear from the pleading. The fraud and the injury must be shown as cause and result, or, as it is commonly phrased in the law, the ''causal connection'' between the false pretenses and the deprivation of property must appear. (3 Bishop's Criminal Procedure, sec. 169 et seq.; 1 McLain's Criminal Law, secs. 680, 681.) Let this be illustrated by a single simple example. The crime charged is that A told B that he had erected a flagstaff two hundred feet high in Golden Gate Park. B was entitled to rely on the statement and did rely on it. It was made to induce B to give A three hundred dollars. The statement was wholly false, and known to A to be wholly false at the time he made it, but B relied on it, and in his reliance was induced to give A three hundred dollars, and did so. The human mind might infer and presume to an unlimited extent over the reason why B gave three hundred dollars simply because A had told him falsely that he had erected a flagstaff in the park. But when the last word was said that word would be speculative 'guesswork, because no causal connection between the false declaration by A and the parting with the money by B is shown. If, however, the complaint further charged that B had commis-

sioned A to erect this flagstaff and had promised to pay him three hundred dollars when it was erected, the motive inducing B to part with his money is at once shown, the causal connection appears and the complaint is a sufficient pleading.

As has already been said, since fraud is never presumed and since a defendant charged with crime is presumed to be innocent, no inferences or presumptions can be indulged in to support a *pleading* radically defective in its effort to charge fraud (*Harding* v. *Robinson,* 175 Cal. 534, [166 Pac. 808]); although, of course, the usual presumptions accompany and all legitimate inferences may be drawn from the *evidence.*

The charges of misrepresentation and false representation in this information are two: 1. Touching the defendant's agency and right and power to solicit, receive, and receipt for "loans and subscriptions on behalf of the 'Fatherland Magazine,' a corporation"; 2. That sundry German-American citizens of the city and county of San Francisco, four of whom are named, "had made contributions of money on behalf of the said corporation," while the truth was that two of these citizens had made contributions in sums less than the defendant stated, and the other two had not contributed at all. Karl Muck it is charged, in reliance on these false and fraudulent statements, "did then and there deliver to said Frederick Griesheimer the sum of three hundred (300) dollars," and Frederick Griesheimer thus and thereby "did then and there willfully and unlawfully, knowingly and designedly and fraudulently receive and obtain from the said Karl Muck the said goods and personal property and money hereinbefore described with intent to cheat and defraud Karl Muck of the same, and the said Frederick Griesheimer did then and there willfully and unlawfully take and carry away the same." There is in this no charge that Muck "delivered" the money to Griesheimer as the agent of the "Fatherland Magazine" as and for a loan or subscription to or on behalf of the corporation bearing that name, and as this is not alleged and as the allegation is simply that he "delivered" the money to Griesheimer, and, finally, as the averments cannot be helped out by guesswork or inferences, this charge amounts to nothing more than that because Griesheimer had falsely represented his agency and his power as agent for the "Fatherland Magazine," Muck gave him three hundred dollars. Why he gave him this three hundred dollars does not appear. The causal

connection is lacking absolutely.   It cannot be said, we repeat, that he gave it to him as the agent of the "Fatherland Magazine," because this is not averred, and not being averred, the pleading is not open to the inference that such was the fact. To the contrary, the legal inference to be drawn is that it was not the fact or it would have been pleaded.   Why, then, under this pleading did Muck give three hundred dollars to Griesheimer or "deliver" it to him, as the pleading phrases it?   Entering the realm of speculation, it may be said, as in the flagstaff instance which we have given, that Muck, interested in Griesheimer, had suggested to Griesheimer that he engage in this employment as agent of the "Fatherland Magazine," and had assured him that he would make him a donation of three hundred dollars when on behalf of the magazine he had succeeded in obtaining "loans and subscriptions" from four or more prominent German-American citizens of San Francisco.   If this were true, or if any one of a thousand other sets of circumstances which will readily come to mind was true and was pleaded, the complaint would be sufficient, but without it there is an absence of all showing why the representation, even though false, should have led Muck to part with his money and deliver it to Griesheimer.

Turning to the second phase of this information—the charge of false representation in the matter of the number of subscribers and the amounts of their subscription—the same difficulty appears.   Why should Muck have delivered three hundred dollars to Griesheimer because Griesheimer had falsely represented that the four men named "had subscribed for and paid to him" (Griesheimer) stated sums of money? Here again we are left in the realm of speculation.   Conceivably, A soliciting for charity from B might be told by B that the latter was in no wise interested in his charity and would not donate to it, but that C was a wealthy man and a miser.   Let A go to C and secure a donation from C and B would double the amount of that donation either as a gift personal to A or as a donation to his charity.   A goes to C, tells him what B has said, declares to him that he will not exact the payment of the money from C but asks C to give him a letter addressed to B stating that he, C, has donated one thousand dollars. With this false letter A returns to B and B "delivers" to him two thousand dollars.   A and C, under this set of circumstances, manifestly have defrauded B, but to plead that fraud

requires much more than the statement that A represented to B that C had subscribed one thousand dollars, wherefore B "delivered" to A two thousand dollars.

It may be well to amplify somewhat the statement hereinbefore made touching the necessity of showing by sufficient pleading the causal connection between the false pretenses and the injury. Says Bishop (3 Bishop's Criminal Procedure, sec. 175) : "Such obtaining must not come independently of the false pretenses, but by their means; so must be the allegation and sufficiently in detail to put the defendant in a position duly to make his defense." Says Cyc. (19 Cyc., p. 429) : "The indictment must show that the property was obtained by means of the false pretense alleged. Accordingly, when there appears to be no natural connection between the pretense and the delivery. of the property, such additional facts as are necessary to show the relation must be alleged. A defect in the indictment arising from failure to show the connection between the false pretense and the obtaining is a material one, and is not cured by verdict." In *People* v. *White,* 7 Cal. App. 99, [93 Pac. 683], the above language from Cyc. is made the basis of the decision, and that it is sound in principle and abundantly supported by the authorities there can be no doubt. And in *People* v. *Kahler,* 26 Cal. App. 449, [147 Pac. 228], it is held that an information which charged a defendant with the crime of obtaining money under false pretense by knowingly and falsely representing that he had a contract for the furnishing of orchestras for cafés and theaters, and that the person to whom these representations were made believed the same to be true and relying thereon paid and delivered to the defendant a certain sum of money, "fails to state facts constituting a public offense for the lack of causal connection between the payment of the money and the false representations." No single authority is given to support the mere declaration of the prevailing opinion that this indictment is sufficient; no single authority, that is, other than section 4½ of the Constitution. Yet the cases holding such an indictment to be insufficient are very numerous and uniform. A few of them only need be cited: *Johnson* v. *State,* 75 Ind. 553; *State* v. *Green,* 7 Wis. 571; *State* v. *Baggerly,* 21 Tex. 757; *Simmons* v. *People,* 187 Ill. 327, [58 N. E. 384]; *Enders* v. *People,* 20 Mich. 233; *Roper* v. *State,* 58 N. J. L. 420, [33 Atl. 969]; *Commonwealth* v. *Dunleay,* 153 Mass. 330, [26 N. E.

870] ; *Copeland* v. *State,* 97 Ala. 30, [12 South. 181] ; *Roberts* v. *State,* 85 Ark. 435, [108 S. W. 842] ; *State* v. *Fitzgerald,* 18 N. C. 408; *Curtis* v. *State,* 31 Tex. Cr. 39, [19 S. W. 604] ; *Campbell* v. *State,* 154 Ind. 309, [56 N. E. 665] ; *White* v. *State,* 3 Tex. App. 605; *People* v. *Gates,* 13 Wend. (N. Y.) 311; *Jones* v. *State,* 50 Ind. 473; *People* v. *Kinney,* 110 Mich. 97, [67 N. W. 1089] ; *State* v. *Whedbee,* 152 N. C. 770, [27 L. R. A. (N. S.) 363, 67 S. E. 60] ; *People* v. *Brown,* 71 Mich. 296, [38 N. W. 916] ; *Jacobs* v. *State,* 31 Neb. 33, [47 N. W. 422] ; *State* v. *Kelly,* 170 Mo. 151, [70 S. W. 477] ; *State* v. *Williams,* 103 Ind. 235, [2 N. E. 585].

Moreover, it is held with equal unanimity that where an indictment or information fails by proper allegation to show this causal connection, then, under the principle above enunciated and the authorities cited, there has resulted a fatal omission of a material allegation with the result that the information or indictment fails to charge a crime. Such a defect in the information, says Cyc., *supra,* "is a material one and is not cured by verdict." Such being the case, not only is a general demurrer adequate to raise the legal point, but it may be raised without demurrer at any stage of the proceedings. That it can be and has been so raised, a brief consideration of some of the many authorities will demonstrate. Thus, in *People* v. *White, supra,* the failure to properly allege the causal connection was raised on general demurrer. The general demurrer was sustained and the judgment following the demurrer, in turn, was sustained by the court of appeals.

In *People* v. *Kahler, supra,* the demurrer was general as well as special. While it is frequently said, and while it is often true, that a failure to plead in accordance with section 952 of the Penal Code may be made the ground of special demurrer, it is equally true that when the ground of demurrer is the failure of the pleader to comply with subdivision 3 of this section by omitting properly to charge "the particular circumstances" when such a charge is "necessary to constitute a complete offense," that ground is a ground of general demurrer if the omission be, as here, of a substantive and material allegation. A reading of the decision in *People* v. *Kahler* will at once disclose that the court was discussing the insufficiency of the pleading under an attack by general demurrer.

In *State* v. *Miller,* 153 Ind. 229, [54 N. E. 808], the defendant moved to quash the indictment simply "on the ground that it did not state facts sufficient to constitute a public offense." Says the supreme court of Indiana: "The indictment was fatally defective in at least two particulars . . . it showed no connection between the false pretenses and the payment or delivery of the money by White to the appellee."

In *Cummings* v. *State,* 36 Tex. Cr. 152, [36 S. W. 266], the indictment charged that the defendant falsely represented to Cohen that he was the owner of and had the right to sell to Cohen for $75 a diamond stud; that Cohen relied upon and was induced by said representation to deliver to the defendant the sum of $75. Against this indictment there was presented no demurrer and no motion to quash. But an objection was interposed to the introduction of evidence under the indictment and this objection the trial court overruled. On appeal the supreme court held this indictment to be fatally defective, in that "there was no allegation that the defendant sold to said Cohen, or anyone else, the diamond stud." Further proceeds the opinion: "We have searched in vain for an allegation that Cummings, as a part of the transaction, sold and delivered to said Cohen said diamond stud. Unless this actual sale and delivery are alleged, we fail to see how the transaction was completed in such shape as to afford the basis of an indictment for swindling."

In *Jones* v *State,* 22 Fla. 532, the indictment charged that the defendant falsely pretended to one Carr that he, the defendant, was one Kirby, by means of which said false pretense the defendant did fraudulently obtain from Carr said money and Carr was induced to part with the money by reason of this false pretense. The defendant was convicted and after conviction moved in arrest of judgment upon the ground that the indictment did not allege facts sufficient to charge any offense and sufficient to support any verdict of guilt. Says the supreme court: "The indictment merely states that Jones represented to Carr that his name was Kirby whereupon Carr gave him $102. It is insufficient unless it be shown that Kirby had a right to demand the money of Carr, and that it was incumbent on Carr to pay the same to Kirby, or that some such relation was existing between Carr and Kirby as would be sufficient to induce Carr to loan or deliver the money to Kirby, of which Jones in his assumed character availed himself."

In *State* v *Saunders,* 63 Mo. 482, the indictment charged that the defendant falsely represented to the prosecutor that he, the defendant, had loaned one Marshall the sum of three hundred dollars; that Marshall was solvent and still owed defendant that sum; that the account was good and collectible, and that defendant could and would assign the account to the prosecutor for the sum of two hundred dollars; that the prosecutor believed such representations and pretenses, confided in them, and parted with the sum of two hundred dollars; that all the pretenses were false, and "by reason of said false pretenses the defendant feloniously obtained from the prosecutor the sum of two hundred dollars." Here the defendant was convicted and on appeal the judgment of conviction was reversed upon the ground that the information failed to state a cause of action, the supreme court saying: "We think the indictment is defective because it is nowhere averred in it that defendant either sold, assigned, or delivered the account to Sullivan (prosecutor), or that Sullivan bought it and parted with his money for it, relying on the false and fraudulent representations of defendant." Further, the court quotes with approval the cases of *Commonwealth* v. *Goddard,* 4 Allen (Mass.), 312, and *State* v. *Bonnell,* 46 Mo. 395, saying: "The indictment, failing to aver material facts necessary to be proved on the trial before a conviction could have been had, is not sufficient to support the judgment and it should have been arrested." In *State* v. *Bonnell,* above cited, the indictment averred that the defendant intending to cheat and defraud one Jacob Hoover of his goods and moneys unlawfully, knowingly, and designedly did falsely pretend to him that he, the defendant, was then and there the owner of and had the right to sell and could make a good title to three head of cattle, whereas, Bonnell was not the owner of the cattle and had no title to them, as he well knew, "by means of which said false pretenses the said Bonnell did feloniously obtain from the said Hoover the sum of $30 with intent to cheat and defraud." The defendant was put upon trial, found guilty, and moved in arrest of judgment upon the general ground that the information was insufficient to charge a crime against him. His motion was denied. On appeal the supreme court held the plea good and reversed the trial court, declaring that the indictment "does not contain an averment of the material facts which the state would be bound to prove before it could

ask a conviction." And further in the discussion set forth
its reasons in admirable terms as follows: "Although under
the liberal system of criminal practice now prevailing in this
state the same strictness is not required that was formerly
necessary, still the pleader must set out in the indictment a
substantive offense, and on trial the prosecution will be con-
fined in the proof to the allegations set forth in the indictment.
It will be observed that the indictment does not allege any
bargain, nor any *colloquium* as to a bargain for the cattle,
nor is there any inducement to show by reason whereof Hoover
parted with his money. I think that in a case like the present,
where the alleged pretenses were injurious only by inducing
another person to buy the cattle as to which said false repre-
sentations were made, such sale, bargain, or agreement, which
was the cause of the party advancing or parting with his
money, should be set out as a part of the facts relied upon and
as a material allegation in the description of the offense."

In *Cooke* v. *State*, 83 Ind. 402, the indictment charged that
the defendant, with intent to defraud Watt, did falsely pre-
tend to him that he, the defendant, was the owner of a cer-
tain tract of land; that it was free from liens and encum-
brances; that it was worth $10 an acre; that the soil was rich,
black loam, from eight to fourteen inches deep; that it was
well timbered with hardwood timber; that there were no
swamps or lakes on it, that the land was situate not more than
six miles from Evart, a railroad town and a good market;
that it was also not more than nine miles from Hersey, the
county seat of the county; which said false pretenses were
made by the defendant for the purpose of inducing Watt to
execute and deliver, and to induce his wife to join with him,
in a deed of conveyance (set forth in full) conveying to the
defendant, in consideration of the sum of two thousand dol-
lars, the said land; that Watt was then and there the owner
of the land described which was of the value of five thousand
dollars; that believing said false pretenses and representations,
and relying on them as true and being deceived thereby, he
and his wife executed and delivered to defendant said deed of
conveyance of the land. It was charged that all these repre-
sentations of the defendant were in fact false and were known
by the defendant to be false. The defendant moved to quash
the indictment, a motion which, of course, is in effect, a general
demurrer to it. His motion was denied. He was convicted

and on appeal the judgment of conviction was reversed on the stated ground that his motion to quash should have been granted, the court saying: "The first objection urged to the proceeding below is that the court erred in overruling the appellant's motion to quash the indictment. It is insisted that the averments in the indictment did not, in any material sense, show that the false pretenses alleged to have been made by the appellant were the operative cause in inducing Watt to sign the deed of conveyance set out in the indictment. In our opinion the indictment was, in the respect suggested, fatally defective. It contained no averment of any contract or agreement between Watt and the appellant concerning Michigan land; or of any interest, either present or prospective, which Watt may have had in the subject matter of the pretenses and representations charged to have been made as an inducement to him to sign the deed. It is true the indictment averred that Watt relied upon these pretenses and representations when he signed the deed. But why did he rely upon them? What reason had he for doing so? That is left to conjecture merely It may have been that an exchange of lands was at the time in contemplation, but the indictment did not make any such averment. Conceding the representations which the appellant may have made concerning Michigan land to have been false in every particular, why should Watt, for that reason, have made him a deed for another tract of land? We are unable to see any natural connection between the two transactions."

In *Wagoner* v. *State*, 90 Ind. 508, the indictment charged with the usual allegations of fraudulent intent and guilty knowledge; that defendant falsely represented that a certain written order for the payment of money in the sum of $5.50 was good and genuine and of the value of $5.50, and was his, the defendant's, property, "by means of which false token and pretense the said Jacob Wagoner did then and there obtain of and from the said Morrison certain personal property [describing it], all of the aggregate value of $5.50; that Morrison relied upon and believed these representations," and "thus relying on the genuineness and validity of said order, then and there delivered said goods to said Wagoner." There followed the usual allegations of the known falsity of the representations. A motion to quash this indictment was made and overruled. Upon appeal following conviction the court

held the indictment fatally defective, saying: "Appellant's counsel further says: 'It is not shown in the indictment that the order was delivered to Lynn and Morrison, or that it was received by them in exchange for, or in payment of the goods.' This objection to the indictment seems to be well taken, is supported by authority, and must be sustained. (Citing cases.)"

In *State* v. *Fitzgerald,* 18 N. C. 410, the defendant moved in arrest of judgment on the ground of a fatally defective indictment. His motion was denied. On appeal the denial was held to be error, the court saying: "It is not necessary to inquire whether by means of such a false averment a cheat or fraud might not be practiced under circumstances which would subject the offender to a criminal prosecution, but it seems to us essential, in a case where there is no obvious connection between the result produced and the falsehood practiced, that the facts should be set forth which do connect the consequence with the deceitful practice."

In *Commonwealth* v. *Dunleay,* 153 Mass. 330, [26 N. E. 871], the agent of an insurance company was indicted for obtaining money under false pretenses by sending to the insurance company a fictitious application upon the acceptance of which he was to receive a commission. The indictment charged that the employment of defendant by the insurance company was to solicit and obtain applications to said insurance company for a compensation to be paid the agent, alleged that the compensation would be due the defendant upon the acceptance by the insurance company of the application. The supreme court declared: "The indictment does not allege that this application for insurance was ever accepted by the company. We think that the connection between the false pretense and the obtaining of the money or the bank check is not set out with the technical precision required in this commonwealth."

In *Commonwealth* v. *Lannan,* 83 Mass. (1 Allen) 590, the indictment charged that the defendant made certain false pretenses to the prosecutor by reason of which he was induced to purchase of defendant a certain horse and gave to the defendant the sum of $250. The defendant's motion in arrest of judgment was denied; the supreme court of Massachusetts held that it should have been granted, saying: "Although the allegation is directly made that he gave and

CLXXVI Cal.—5

delivered to the defendant certain property in payment for the horse, it is not averred that he made this payment and delivery by reason of the false pretense alleged.''

In *People* v. *Brown,* 71 Mich. 296, [38 N. W. 916], the indictment charged that the defendant represented to the complaining witness that he was the agent of a corporation; that the corporation was a responsible and reliable company; that it had a paid-up capital of one hundred thousand dollars; that it would faithfully fulfill all its contracts, and that relying on these representations the complaining witness was induced to sign and deliver two certain promissory notes to the defendant. After conviction defendant appealed, urging that the information did not state a public offense. The supreme court of Michigan said: ''The indictment does not point out for what consideration these notes were given, or to whom they were payable, or whether negotiable or not. It does not show that the corporation, directly or by agent, made any agreement or had any dealings with respondent. In other words, it does not show in what way it concerned Harmon—whether the Bohemian Oat & Cereal Company was an honest and responsible or a dishonest and swindling concern. There is nothing to connect the notes with any fraud practiced on Harmon. The information charged no offense.''

In *State* v. *Freeman,* 103 Miss. 764, [60 South. 774], the indictment charged that the defendant falsely and fraudulently pretended and represented to the complaining witness that he, the defendant, was authorized to represent a loan company, and ''by means of the said false and fraudulent representations and false pretense, procured and obtained from said Rogers, good and lawful money of the United States,'' etc. A general demurrer to the indictment was sustained. The state appealed. The demurrer was sustained, the court saying: ''In an indictment for false pretenses, it is necessary to charge that the pretenses were false; that the defendant knew them to be false; that he got from another certain money or other valuable things; and that the pretenses were the moving cause whereby the money or things were obtained. The indictment fails to show why Rogers paid the money to the appellee, or why such false pretense should have moved him to make the payment to the appellee. The indictment fails to specifically allege the false pretense, so as to show upon its face why such pretense was the moving cause whereby the

money was obtained from Rogers. In fact, it fails to charge with clearness that the pretenses were enough to induce Rogers to turn over the money to the appellee.''

In *Roper* v. *State*, 58 N. J. L. 420, [33 Atl. 969], the indictment charged that the defendant falsely represented to the prosecutor that a certain company was a *bona fide* building and loan association and had seventy-five thousand dollars cash on hand to loan. Then followed allegations declaring the falsity of these statements, and the indictment proceeded to charge that ''by color and means of such said false and fraudulent pretenses the said Roper did then and there willfully, unlawfully, and feloniously obtain from the prosecutor three thousand dollars with intent then and there to cheat and defraud him thereof.'' The supreme court of New Jersey declared the indictment to be plainly insufficient, saying: ''The rule of pleading in these cases is entirely settled. Lord Mansfield, in a case before him, said that the indictment must contain a history of the offense; that is, the essential facts must be set forth to this extent; that is, if the facts stated shall be proved, the defendant's guilt will be established. The indictment before the court, on this record, is fatally defective.

In *Simmons* v. *People*, 187 Ill. 327, [58 N. E. 384], the court overruled defendant's motion to quash the indictment and his motion in arrest of judgment based on the insufficiency of the indictment. The indictment was framed with much elaboration and charged in six counts. It was charged that the defendant falsely represented to the complaining witness that he was the agent of a syndicate controlling certain corporations, that his son was another such agent, and authorized on behalf of the syndicate to take title of the complaining witness' lot in his, the son's, own name as trustee of the syndicate, and to agree to pay in his own name on behalf of the syndicate an encumbrance on the complaining witness' land of seven thousand dollars; that these false pretenses were made to induce the complaining witness to execute a deed conveying a lot to defendant's son, and that the prosecuting witness, by means of such inducements, did execute and deliver said deed to defendant's son, with much more to like effect. The supreme court of Illinois declared that notwithstanding its elaboration, the indictment did not ''show that any such pretenses had any connection whatever with the signing and delivery of Bryant's deed''; saying further: ''It was neces-

sary by the indictment to connect them with the making of Bryant's deed, so as to show that they operated in obtaining his signature. The connection between the pretenses and obtaining the signature must appear either by a natural connection between them, or by facts properly averred, so that the facts will lead to a necessary legal conclusion of the guilt of the defendant. The counts in question do not show in any way that the false pretenses as to the character in which the defendant was acting induced the making of the deed."

In *Curtis* v. *State*, 31 Tex. Cr. 39, [19 S. W. 604], the indictment charged that the defendant falsely represented to one Hawkins that he had sold certain land belonging to him, the defendant, for $250 which would be due and payable in November; that these representations were false, and that "by means thereof he induced Hawkins to deliver to defendant a certain mule of the value of $110." On appeal after conviction the supreme court held that the motion in arrest of judgment should have been granted, saying: "There is only one question that need be considered, and that is the sufficiency of the indictment. It is not alleged that any contract was made nor that Hawkins was to be paid out of the said sum of $250 which was to become due November 15, 1891, nor that he was to be paid at all, except by inference. The indictment should allege all the material facts necessary to be proved to convict the defendant, and not leave them to inference and argument (citing cases). Tested by these requirements, we think the indictment fatally defective."

In *Roberts* v. *State*, 85 Ark. 435, [108 S. W. 842], the defendant represented to the complaining witness that he was a graduate eye specialist, holding diplomas from three separate schools; that he was competent to treat the eyes of the complaining witness' son and had lawful authority so to do, and falsely pretended that he was a regular practicing oculist, and "by means of which false and fraudulent representations he, the said P. T. Roberts, did then and there fraudulently and feloniously obtain from him" certain moneys and promissory notes, "whereas in truth all of the above representations were false." Defendant, convicted, made a motion in arrest of judgment. It was denied. Upon appeal the supreme court held the indictment insufficient upon the ground that the causal connection was not shown, the court saying: "A false representation by one claiming to be a physician, that he is

a graduate of colleges and is authorized by law to practice his profession, has, of itself, no apparent tendency to induce a person to part with his money, unless such person is alleged to have engaged his services and paid him for them on account of the false pretenses. The allegations cannot mean that the defrauded person paid the money solely on account of the alleged false pretenses, for that alone is not calculated to induce one to part with his money; and yet it cannot be inferred, in the face of the omission, to allege anything else, that something else was done which induced the payment of the money.''

It is thus made to appear that the omission to charge the causal connection results in a fatal defect in the information or indictment of which the defendant may avail himself by general demurrer or by motion in arrest of judgment. Nor is this defect cured by section 950 of the Penal Code, which declares that the indictment or information must contain ''a statement of the acts constituting the offense, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended.'' The argument which invokes this section in aid of this information would seem to imply that any indictment or information should be held sufficient if a person of common understanding knew that the indictment meant to charge a crime. The prevailing opinion declares that ''no person of common understanding could fail to understand that it was charged by necessary inference at least,'' etc. Here, then, is the startling announcement that the sufficiency of an information is no more to be tested by the long established and vitally important rules governing the laying of criminal complaints, but is to be determined by what this court may think a man of ''common understanding'' indulging in inferences might conclude that it meant. Heretofore I have held the belief that the code meant that the language of an indictment should be such that the ordinary man would understand the *language* and know what it meant, but that the sufficiency of that language to charge a crime did not rest on what the ordinary man understood it to mean, but always on whether the reasonable meaning of the things said was adequate under the rules of criminal pleading. This belief must now be discarded. But I cannot discard it without the protesting declaration that such until now has never been the law of this state, and that the new law as now declared finds as little warrant in section

4½ of the Constitution as it does in section 950 of the Penal
Code. The right of a defendant to have a crime charged
against him with precision is a substantial right. The
right of a defendant not to be put upon trial unless a
crime is charged against him with due exactness is also a
substantial right, and while this provision of the Constitu-
tion, with this section of the code, is designed to aid many
forms of lameness in pleading, in rulings on evidence and
in the giving of instructions, it was never designed as a
panacea for all the infirmities of legal procedure, and least of
all to breathe life into a criminal information or indictment
which without it would be a corpse. For, I repeat, it is essen-
tial to every valid indictment that every fact necessary to
charge a crime should be made the subject of direct averment
and not left to inference. (*Barton* v. *People,* 135 Ill. 405, [25
Am. St. Rep. 375, 10 L. R. A. 306, 25 N. E. 776] ; *Connor*
v. *State,* 29 Fla. 455, [30 Am. St. Rep. 134, 10 South. 891] ;
19 Cyc. 419 ; 20 Cent. Digest, pars. 31–53.) Says Lord Ken-
yon in *Rex* v. *Holland,* 5 Term Rep. 607 : ''Indictments should
be certain, that posterity may know what law is to be derived
from the record.'' Says Gibson, C. J., in *Hartman* v. *Com-
monwealth,* 5 Pa. 60 : Precision is ''of last importance to the
innocent, for it is that which marks the limit of the accusation
and fixes the proof of it.''

Let me now address myself to the first phase of what I
conceive to be a misapplication and an undue extension of
the meaning of section 4½ of our Constitution. The reason-
ing of the prevailing opinion bears no other construction than
this : That because ''a reader of the information could hardly
draw from it any other inference'' than that the information
meant to say that which in terms it does not say, and because
''no person of common understanding could fail to understand
that it was substantially charged by necessary inference at
least'' that the defendant had committed the crime of obtain-
ing moneys by false pretenses, and as the evidence was suffi-
cient to show his guilt, all errors, irregularities, and omissions
in the information (as well as in the trial) become immaterial,
because a guilty man has been found guilty, and therefore
there is no ''miscarriage of justice.'' I have said, and I think
I have abundantly shown, that there is such a miscarriage of
justice within the meaning of our law when any man is forced
to trial upon a criminal charge under an information or in-

dictment which does not measure up to the rules of legal suffi-
ciency. The principle is not that the evidence subsequently
taken may show his guilt, but that there was no proper pro-
cedure before the court to justify the taking of that evidence,
and this the citations and quotations above given abundantly
establish.

I have said that the reasoning of the prevailing opinion
bears no other construction than that which I have given it.
To the end that if it was susceptible of some other construction
that might be made plain, I submitted to the learned chief
justice the following questions, stating that his answers to
them would tend to clarify to my mind his views of the law
and of the scope and applicability of section $4\frac{1}{2}$:

"1. The indictment charged that 'A defrauded B of three
hundred dollars,' no more. Demurrer overruled. The evi-
dence clearly established that within the state of California
and within the period fixed by the statute of limitations A de-
frauded B of three hundred dollars, by the method of fraudu-
lently selling land twice (Pen. Code, sec. 533). Is the con-
viction good, and if not, under your opinion in the Gries-
heimer case, why is it not good? Every man of common
understanding knows what a charge of defrauding means,
namely, that by some trick or device or pretense A cheated
B out of three hundred dollars. True, fraud is but a conclu-
sion of the pleader, and the facts are not pleaded, but they
are implied, and if defendant is guilty, he knows what those
facts are better than anybody, and if he is innocent, he has
no occasion for worry and is not injured, and particularly is
this true when at the trial defendant was offered all the time
he desired to produce evidence to meet that of the prosecution.

"2. The indictment charged that A 'killed a man,' no more
than this. Demurrer overruled. The evidence clearly estab-
lished that within the state of California A murdered B. Is
the conviction obtained under such an indictment good, and
under your Griesheimer opinion why is it not good, since 'any
man of common understanding would understand' that the
indictment was not a piece of waste paper, and so that it
meant to charge that the killing was murder? True, the venue
is not laid, but any man of common understanding would know
that the state would not charge A with the crime unless it was
committed within its boundaries. True, the name of the man
killed is not given, but if the defendant killed him, he knows

who is meant, and if he did not kill him it makes no difference who is meant, and, besides, the defect is cured by the evidence which clearly establishes that the man murdered was B. Not only is this defect cured by the evidence, but it is cured by the verdict which so finds.

"3. The indictment charged that 'A while walking with B committed robbery.' Demurrer overruled. The evidence clearly established that A, while walking in San Francisco with B, at a time within the statutory period of limitations, by force and fear and against B's will, feloniously took from B's possession his watch. Is the conviction good, and under your Griesheimer opinion why is it not good? Robbery is a crime. The indictment charged a crime. Any man of common understanding knows this. Any man of common understanding would infer that the indictment meant to charge that B was the victim of robbery, and, in any event, the evidence established it, the jury found it, and the defects are cured by the verdict.

"4. The indictment charged that 'A committed every felony denounced by the Penal Code.' Demurrer overruled. On trial the prosecution elected to stand on seven designated felonies and so notified defendant. Defendant was given all the time he desired to prepare his defense to each and all of these felonies. He was convicted on one of them, namely, manslaughter. The evidence overwhelmingly established his guilt. Is this conviction good, and under your Griesheimer opinion why is it not good?

"5. Under the same state of facts above given the defendant is convicted of two of the designated felonies, manslaughter and robbery. Why, for the same reasons given in your opinion in the Griesheimer case, are not both convictions good?"

To my regret these questions have remained unanswered.

2. The prevailing opinion discusses an instruction which the court gave, and, broadly declaring that "it requires a somewhat criticial and technical analysis of the particular instruction complained of to find anything therein in conflict with this well-settled law," further declares that "the injurious effect claimed" could not "reasonably have been attributed by the jury to the instruction." I did not understand, until the chief justice so states, that the "jury attributed any injurious effect" to the instruction. But passing this by, it will be noted that this conclusion rests upon bald assertion, unsup-

ported by argument, and while unquestionably this is the easiest way of disposing of a legal proposition, it is certainly the most unsatisfactory. It becomes incumbent on me to show by a citation to record facts, not even adverted to in the prevailing opinion, first, that the instructions are in radical conflict, and, second, that there is strong probability that the instruction complained of, erroneous in law, worked serious injustice to the defendant, even though no injurious effect was attributed to it by the jury.

It will be remembered that the information charged the showing by defendant to the prosecuting witness of a certain written list, as to which the defendant represented that each person whose name appeared on the list had subscribed the amount written opposite his name, and in particular that four German-American citizens, whose names are pleaded, had each given the amount set opposite his name. The information contains no allegation of the falsity of this list, saving as to the four names mentioned. The evidence corresponded to the allegation in showing that two of the named men had subscribed lesser amounts than those stated in the list and charged in the information, and that two others had not subscribed at all. In argument the district attorney repeatedly declared as follows:

"If we bring in one it is as good as a thousand; and we are not supposed, and we are not obliged, to bring in all the people whose names appear on that list; . . . Now, suppose, gentlemen, that the only name that was on the list at the time it was presented to Dr. Muck was the name of Mr. Ohlandt; if we prove that as to Mr. Ohlandt the amount had been changed from $50 to $150, that circumstance would be alone sufficient to convict the defendant in this case."

It is perfectly true that where an information or indictment charges several false pretenses, a conviction may be had and will be sustained by proof of only one of such pretenses, provided, always, that it be established to the satisfaction of the jury that the particular pretense which is so proved was material in inducing the complaining witness to part with his money or property. One of the court's instructions so indicates. Another, however, declares as matter of law, that if there was a false representation as to the amounts actually subscribed by some of those whose names are on the list, the defendant is guilty. Now, it must be apparent that if A pre-

sents to B a subscription list showing that twenty or fifty men
have contributed stated amounts of money to a given cause,
that the false representation as to the amount which one or
two had subscribed may or may not be the material induce-
ment to the subscription of the complaining witness. So, if
a man presents a list containing purported subscribers to the
stock of a corporation, the falsity of the statement that one
man had subscribed might be of no materiality whatsoever,
while the falsity of the statement that another man had sub-
scribed might be very material, as the complaining witness
might subscribe only upon the faith that some particular man
or men of approved business sagacity had already become
stockholders. But in every such case the question is an evi-
dentiary one for resolution by the jury itself. It is for the
jury to say, under the peculiar circumstances of each case,
whether or not the evidence establishes that the proved false
statement was a statement inducing the prosecuting witness to
part with his money or property. It is not for the court,
under such circumstances, to charge the jury that any such
false pretense, when established, is in and of itself material.
So that, while the judge of the court was careful enough to
instruct as he did in the one instruction concerning the
materiality of the false pretense before a conviction could be
based upon it, in the other of these instructions following
the declaration of law made by the district attorney he erred
in stating, in effect, that proof of the falsity established the
materiality as matter of law.

What, then, is the logical, reasonable result of a reading
of all of the instructions bearing upon this point? It is and
can be only this: that the jury was instructed that they must
find the materiality of any false pretense before they could
base a conviction upon it. But specifically, as addressed to
the evidence of this case and as matter of law, they were told
that "if misrepresentations are made as to amounts actually
subscribed or contributed, and that Karl Muck, believing in the
truth of the representations as to those amounts, himself sub-
scribed toward the fund," this misrepresentation the jury is
to find was material. It is perfectly easy, of course, to de-
clare that this is a "somewhat critical and technical analysis,"
but we need not even rest this discussion upon the counter
asseveration that it is the only natural and legal analysis.
For by adding to this discussion that which is omitted in the

prevailing opinion, the injury, I think, will become plain, even to the man of "ordinary understanding." Those omitted matters are, first, the repeated argument of the district attorney, a fraction of which is above quoted, as where he says, "if we prove that as to Mr. Ohlandt that amount had been changed from $50 to $150, *that circumstance would be alone sufficient to convict the defendant in this case."* Who can doubt but that the instruction complained of was directly and designedly addressed to this oft-declared view which the prosecuting officer took of the law and of the evidence? But, second, the injury becomes the more apparent because it manifestly appears from the evidence—that of Dr. Muck himself—that he was in no wise influenced in his contribution by any false representation as to any particular name upon the list, nor as to any particular amount set opposite that name. Thus his testimony is:

"Q. Why did you give this man the money, Doctor?

"A. First of all because he told me it was to help the German cause, and then because he showed me this list of contributions from very famous San Francisco citizens who gave the money for the same purpose."

Mr. Ohlandt, "a famous San Francisco citizen," had in fact subscribed. Would the man of common understanding, under this evidence, and unless positively instructed by the court to the contrary, say because one name upon a list of twenty or thirty was improperly or falsely there, or because Mr. Ohlandt had given $50 and not $150, in the face of the testimony of the complaining witness himself, that these trifling variances or false representations were in any sense material? Yet by the argument of the district attorney, adopted by the court in its instruction, any one of these is declared to be sufficient to warrant a conviction. And the reason for this will appear in the discussion of the next proposition, that reason being that unless the prosecution could make good its contention upon this evidence, in other words, unless it could have the jury told that such a misrepresentation established its case, the evidence failed utterly, in at least one vital point, to justify the conviction.

3. The foregoing statement is made with a due sense of responsibility occasioned by the language of the learned chief justice to the effect that the evidence "undoubtedly shows his guilt of the offense charged." But neither this statement nor

the following one, that the "case falls as clearly within the provisions of section 4½, article VI, of the Constitution as any case that has ever been presented to us," being mere declarations, can be permitted to stand as a substitute for a fair discussion of the evidence itself. The indictment charged that Dr. Muck's money was given by him to the defendant. The profession is told to read this indictment as meaning to charge and as sufficiently charging that Dr. Muck's money was given to the "Fatherland Magazine" through the agency of defendant. As the indictment in fact charged the offense to have been completed by the delivery of the money to defendant, so the evidence to establish the offense charged would have been complete on a showing of a delivery to and reception by the defendant of that money. This showing was made. The prosecuting officer and the trial court, not then enlightened by this court as to the true construction of the information, and having produced evidence sufficient to establish their charge, namely, the giving of the money to the defendant, there rested, as under their pleading they were entitled to rest. But it now appearing that the information must be read to charge that the money was given to the defendant for the "Fatherland Magazine," there is an utter and absolute failure of the evidence to show that the "Fatherland Magazine" did not in fact receive the money. The information, as this court makes it read, is (and necessarily must be to charge any crime at all) that Karl Muck gave the defendant three hundred dollars for the "Fatherland Magazine" on the defendant's representation that he was the authorized agent to solicit and collect donations and subscriptions for that magazine; and that the defendant did not pay the money over to the "Fatherland Magazine." To simplify the matter, it is as though the information charged that the defendant represented himself as an authorized collector for the Red Cross and that the complaining witness, relying on this representation, gave the defendant three hundred dollars for the Red Cross. Manifestly, if the defendant paid the money over to the Red Cross, the complaining witness has not been injured. Manifestly, he is only injured if the defendant did not pay it over. Therefore the averment that it was not paid over is necessary to charge the crime, and proof that it was not paid over is necessary to establish the crime. Yet this is brushed aside upon the asserted authority of *People* v. *Bryant,* 119 Cal. 595, [51 Pac.

960]. The case of *People* v. *Bryant* in its essentials is this: The defendant sold to plaintiff a note and mortgage under false representations touching the character of the land, pointing out as the land mortgaged land which was in fact not included in the mortgage. The lands actually mortgaged were of no value. The holding of this court is that such false representations, as it was in reliance upon them that the complaining witness purchased the note and mortgage, are sufficient when established to make out the crime charged, without regard to the question whether or not the complaining witness could ultimately reimburse herself by civil action. The opinion of this court was upon a judgment after demurrer sustained to the complaint. In sum, it is as though A sold to B a promissory note signed by himself and Andrew Carnegie upon the representation that Andrew Carnegie's signature was genuine. That signature being charged and proved to be fictitious and the complaining witness charging and proving that he purchased the note upon the faith of that signature, the offense is established without regard to the question whether or no the complaining witness might ultimately collect the principal and interest of the note from the one genuine maker. What this case has to do, or can have to do, with a pleading which charges that the complaining witness gave the money to the defendant for the "Fatherland Magazine" upon the representation that the defendant was a collecting agent for that magazine, and that the defendant never paid it over to the magazine, while the evidence establishes only the payment to the agent and fails utterly to show that he did not pay it over to the magazine, I am unable to comprehend.

I do not think it will be contended that it was incumbent upon the defendant to prove his innocence by showing that in fact he had paid it over to the "Fatherland Magazine." I take it that it will be conceded that it was the duty of the prosecution in establishing a case under the information, as this court makes it read, to show that the "Fatherland Magazine" did not receive the money. The evidence of Dr. Muck himself is as follows: "I did not give it [the money] to him [defendant]. I gave it to the 'Fatherland.' He told me so." The gravamen, therefore, of the offense charged in this indictment by the inferences in which the prevailing opinion indulges, is that Dr. Muck was induced to make a contribu-

tion to the "Fatherland Magazine." This contribution he gave to the "Fatherland Magazine" by delivering it to the man whom he believed to be the accredited agent of the "Fatherland Magazine." Even the man of common understanding would recognize that the whole case falls to the ground if the money was in fact delivered to the "Fatherland Magazine." Even the man of common understanding, knowing that it is essential to a valid conviction to establish every element of the crime, recognizes that it was vital to the case of the prosecution to show that the "Fatherland Magazine" did not receive this money. No attempt to make such a showing was even attempted, for the very obvious reason above given, that under the indictment as written the information charged that the money was given to the defendant and the offense was established by showing his reception of that money. Says Bishop (3 New Criminal Procedure, sec. 183), discussing false pretenses: "It is essential that the indictment should be in terms to avoid any variance at the trial between allegation and proof. Conformity to this rule is attained only by the exercise of a practical skill in conjunction with legal knowledge." Conceding that this court can and has supplied the legal knowledge lacking to the sufficiency of this indictment as drafted, it is impossible for me to perceive how it can also supply the lack of sufficient legal evidence. And in conclusion I say that no conviction which has come under my observation falls more clearly within the provisions of section 4½, article VI, of the Constitution, in establishing a miscarriage of justice.

Melvin, J., and Lorigan, J., concurred.

Rehearing denied.