[Crim. No. 4637. In Bank. Feb. 19, 1946.]

THE PEOPLE, Respondent, v. GEORGE KANE, Appellant.

George Stahlman for Appellant.

Robert W. Kenny, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant took from Marie H. Echols approximately $2,700 which belonged to her employer and which she was carrying to the bank. At the time he committed the offense defendant was armed with a .38 caliber revolver. A jury found him guilty of robbery of the first degree. From the judgment of conviction entered upon this verdict and from an order denying his motion for new trial, defendant appeals. According to defendant's testimony Miss Echols and he agreed to simulate a robbery and each was to receive a share of the proceeds. The trial court refused certain instructions, requested by defendant, as to the specific application of the doctrine of reasonable doubt to the facts as testified to by defendant and corroborated to some extent by prosecution witnesses. In the circumstances shown, hereinafter related in more detail, we cannot say that the failure to instruct the jury as requested did not prejudice defendant.

Miss Echols testified as follows: She was assistant manager of Eaton's Restaurant. For "quite some time . . . getting into months" before the commission of the offense she saw defendant, who was employed by a linen supply company, nearly every day when he delivered linen to the restaurant. She and defendant chatted when he came in the restaurant. They called each other by their first names; Miss Echols did not know defendant's last name. About three or four weeks before the commission of the offense the defendant left the employ of the linen supply company and Miss Echols did not see him until October 25, 1943. On that day, at about 1 o'clock p. m., as was her custom, she walked toward the bank, carrying about $2,700 in a money bag. When she was about one and one-half blocks from the restaurant the defendant approached her. Although he wore

dark glasses and two strips of adhesive tape across his nose, she recognized him at once. "He reached for the [money] bag and said, 'I will take this.' . . . I knew him so I just said, 'Don't be foolish.' . . . He pulled a gun and said, 'I am not fooling. This is loaded. . . . I will shoot you.' . . . I said, 'Don't be foolish. I know you.' With that he struck me over the head with the gun and knocked me down and took the money and left. . . . He got in the car and drove away. . . . The turtleback was up. . . . [T]he head injury was not serious; it was the ligaments in my back; when I was knocked to the sidewalk they were torn."

Ralph Spellman, a friend of defendant, testified that at about 6 o'clock in the evening of October 25, 1943, defendant gave him a loaded .38 revolver and asked Spellman to "keep the gun for him, he didn't want to have it in his car." The gun was identified by Miss Echols and defendant as the one with which defendant struck her.

At about 1:30 o'clock in the afternoon of October 25, 1943, (i. e., one-half hour after the crime was committed) police went to defendant's apartment. No one was there. In a dressing table they found $2,334 in currency. The police waited for defendant. At about 5:30 p. m. he came to his apartment. Officer Brennan testified that defendant "seemed very much surprised to find someone in his apartment and he says, 'Well, what is the matter?' And I answered, 'Why, you know what is the matter. . . . We are here on that holdup this afternoon that you pulled.'" Defendant denied any knowledge of and connection with the crime. He was searched and $450 was found in his pocket. At about 6:30 p. m. defendant's half brother, who lived with him, arrived. Defendant continued to deny that he had stolen any money until the officers told him that they had found about $2,300 in his apartment. He then admitted that he "pulled the holdup." Defendant went with the officers to Mr. Spellman's home and Spellman gave the officers the gun that had been left with him.

Defendant was taken to the police station. There he told the officers, "I needed money bad and I knew that they had quite a lot of money on week-ends from Eaton's. . . . I went down there the day before, or two days before . . . and I watched the girl take the money to the bank and I knew about what time she went by, and I went down there on the 25th, today, . . . and I waited until I saw her come out and start to the bank with the money. . . . I walked up to her and I

stuck the gun on her and I told her to give me the money. . . . She started to wrestle over the bag of money, so . . . I hit her with the gun. . . . The blow knocked her down to the pavement and I jerked the money bag away from her and ran to my car and got in the car and drove away. . . . I had the turtleback up on my car so nobody could read the license. . . . I brought the money back to the apartment. . . . I took some tens out and put in my pocket and hid the rest of the money in the apartment. . . . I imagine it was kind of foolish to do after I see it all now. . . . I guess I must have been nuts.'' And several times, before and after they went to the police station, defendant asked the officers, ''How did you find it out?''

Officer Wiseman, who was with Officer Brennan at the time of the arrest, was also a witness. He told the jury that, in reply to his question (in a conversation at the Wilshire Station Detective Bureau) ''whether he did not think it was foolish to hold up someone who knew him,'' defendant said, '' 'Well, I didn't think she would recognize me.' And I asked him if that was why he had put dark glasses on and the adhesive tape on his nose, and he said 'Yes.' ''

Defendant's half brother, who lived with defendant, testified that when he came home on the evening of the 25th and learned of the crime, he asked defendant, ''Why did you do it, George? If you needed money I had some money and I would have given it to you,'' and defendant answered, ''Well, I didn't want to ask you for it.''

Defendant Kane testified that he had known Miss Echols for about two and one-half years while he was a route man for the linen supply company. He talked with her ''at least fifteen or twenty minutes every morning'' when he delivered linen to the restaurant. He knew that she took money to the bank and three or four months before the crime ''the conversation got to that [sic] being some way we could make this easy money.'' After the making of ''easy money'' was first mentioned, ''it seems there had not been one single day we did not plan.'' Miss Echols ''told me the money was insured and if we could get away with it we could split.'' They talked over the matter in a small office in the restaurant, within fifteen feet of where the cooks and dishwashers were working, but they could not be overheard. Gradually they developed a plan. Defendant left the linen supply company and got a night job. Defendant ''would call her on the phone

at Eaton's . . . usually on Monday morning'' to ascertain the amount of the week-end receipts.

On the morning of October 25 (Monday) he telephoned. She said, ''This is a nice week-end.'' He replied, ''O. K. I will meet you at Normandie and Wilshire.'' They had agreed to ''make it look like a real robbery. . . . I had that adhesive tape on my eyes, and I had glasses so if anybody did see me they wouldn't recognize me, and I was willing to take all the blame. . . . I knew the exact time she was coming as we arranged; at one o'clock she came walking down the street and I stepped out and said, 'We will make it look like a real robbery so . . . I will push you down and kind of make it look like I am hitting you, and I will take the money and speed away.' I had my turtleback up in the back [and carried a gun] so as to make it look real.''

When defendant was arrested at his apartment, the officers showed him a warrant ''either with her name on it or with my car license number.'' Three or four times he asked the officers how they learned that he had taken the money. At that time he did not know that Miss Echols had designated him as the guilty man. He did not tell the officers that Miss Echols was involved because he wanted to protect her ''as arranged'' and he could not believe that she had ''crossed him up like that.'' His first statements to the officers, at his home and at the police station, as related hereinabove, indicate that he did not then disclose that he was acquainted with Miss Echols. Such conduct is consistent with his testimony regarding the asserted plan to protect her.

Miss Echols denied the matters testified to by defendant concerning the plan to simulate a robbery. She testified that two weeks before the crime she had returned to work after a vacation and that she had not seen or spoken to defendant Kane during those two weeks.

The testimony of Miss Echols and of defendant and defendant's statement to the police, are in substantial accord as to the manner in which defendant took the money. The evidence as to whether he took it against her will is sharply conflicting. Miss Echols did not testify directly that she was afraid. According to defendant's version of the taking of the money he (and Miss Echols) were guilty of grand theft; they were accomplices. His testimony, as above stated, is corroborated to some extent by evidence introduced by the prosecution. Miss Echols testified that when defendant ap-

proached her with the gun she told him more than once, "Don't be foolish. I know you." Yet Officer Brennan testified that defendant seemed very surprised to find the police in his apartment when he entered it about four and one-half hours after the taking of the money and that defendant asked several times, "How did you find it out?"

The instructions given covered only the offense charged in the information; i. e., robbery of Miss Echols while armed with a deadly weapon. No instructions were given defining grand theft or explaining the difference between theft and robbery or defining an accomplice. A jury of laymen would not necessarily understand without specific instruction the distinction between robbery and theft. Since defendant admittedly used some substantial force in taking the money the record seems to us to afford reasonable support for the defendant's contention that the jury may have been confused and thought he was guilty of robbery whereas in truth they were convinced beyond a reasonable doubt only of such facts as made him guilty of grand theft.

█ Defendant requested, and the trial judge refused to give, the following instructions: (1) "Before you can convict the defendant in this case, you must be convinced beyond a reasonable doubt that the property taken was against the will and without the consent of Marie H. Echols."

(2) "If you believe from the evidence that there was an agreement or understanding between the defendant George Kane and the complaining witness Marie H. Echols, or permission upon the part of Marie H. Echols, that the property should be taken by the defendant George Kane, then you must find the defendant not guilty, or if you have a reasonable doubt as to whether or not this consent and permission was given by Marie H. Echols to the defendant George Kane, then you should resolve this doubt in favor of the defendant and acquit him of the charge as contained in the information."

(3) "You are instructed that if the complaining witness, Marie H. Echols, in any manner instigated and encouraged the commission of the offense which amounts to consent to the wrong complained of, then you should find the defendant not guilty."

The proposed instructions, although not grammatically perfect, are correct and simple statements of law pertinent and material to defendant's theory of the case and show its application to the evidence introduced. In *People* v. *Eckert* (1862), 19 Cal. 603, 605, this court said: "The fact pointed out by

this instruction it was material for The People to prove, in order to establish the defendant's guilt under the other circumstances of this case, and as the charge given by the Court as to reasonable doubt, though appropriate, was general in its terms, the defendant had a right to ask an instruction that if there was a reasonable doubt as to this essential fact, the defendant should have the benefit of it.'' Defendant here was entitled to have the jury advised directly and clearly as to the law applicable to the defense to the charge of robbery in order that they should have clearly in mind that the taking, even though it was with a display of force, to constitute robbery, must have been actually against the will of Miss Echols, not with her connivance or abetment, and not merely against the will of the owner of the money. The essential, and to a layman somewhat fine, distinction between robbery and grand theft, the definitive attributes of an accomplice (Pen. Code, §§ 31 and 1111), and the application of the doctrine of reasonable doubt to the most important and difficult question presented to the jury, should not have been left either wholly unexplained or derivable only from inference.

The People point out the grammatical imperfections in the first and third requested instructions and urge that in the form submitted the instructions were ambiguous, incorrect, and confusing, and that (as stated at p. 630 of 8 Cal.Jur.) ''a reversal because of the refusal of an instruction is justified only when it appears that it was the duty [of the trial judge] to give the instruction exactly as requested. If any part of the instruction ought not to have been given, whether erroneous as a matter of law or merely misleading, its action will be affirmed.'' The statement quoted from California Jurisprudence has not been, and cannot be, given unlimited application by the courts of this state. Extended discussion of this matter is not necessary, however, for it is apparent from mere perusal of the requested instructions that they are neither erroneous as a matter of law nor misleading and that their slight grammatical imperfections do not render them ambiguous or confusing.

The People further urge that, since the statutory definition of robbery (Pen. Code, § 211) and the statutory instruction concerning reasonable doubt (Pen. Code, § 1096) were read to the jury, they were fully informed as to the law relating to defendant's theory and the refusal of the more specific instructions requested was not erroneous or, if it was erroneous, could not have prejudiced defendant.

As to the general statutory definitions of robbery and reasonable doubt, which were given as instructions, a statement from *People* v. *Cook* (1905), 148 Cal. 334, 347 [83 P. 43], is apt: "It is true that the instruction given stated the law correctly; but it was brief, general, and colorless in comparison with the instruction asked, and had the effect of minimizing the importance of a consideration which could not have been stated with too much emphasis."

The situation is similar to that presented in *People* v. *Visconti* (1916), 31 Cal.App. 169, 170 [160 P. 410, 411], where the court said, "In view of the testimony offered for the purpose of establishing an alibi, the defendant asked the court to give an instruction by which the jury was to be informed that in making the proof of an alibi the defendant was not obliged to establish that defense by a preponderance of evidence or beyond a reasonable doubt, but that it was sufficient to entitle him to a verdict of not guilty if the proof raised in the minds of the jury a reasonable doubt as to the presence of the defendant at the place where the crime was alleged to have been committed and at the time referred to in the information. The court refused to give this instruction, or any instruction upon the matter of the defense of an alibi. It seems to be conceded, as it must, that the instruction as proposed was pertinent and proper; but the contention is made that inasmuch as the trial judge did instruct the jury that they must believe beyond a reasonable doubt that defendant committed the crime, no prejudice would arise by reason of the failure to instruct directly upon the matter of the alibi proof. The instruction of the court which was given was general, and stated in substance that before conviction could be had it was incumbent upon the prosecution to prove beyond a reasonable doubt all of the matters alleged in the information. We think that defendant was entitled to have some particular and specific instruction given touching the matter of his defense of an alibi." (In accord are *People* v. *Garrett* (1928), 93 Cal.App. 77, 78-79 [268 P.1071]; *People* v. *Vasquez* (1928), 93 Cal.App. 448, 452 [269 P. 549]; *People* v. *Wilson* (1929), 100 Cal.App. 428, 430 [280 P. 137]; *People* v. *Quinn* (1931), 111 Cal.App. 614, 620 [295 P. 1042]; *People* v. *Parker* (1933), 135 Cal.App. 761, 762 [27 P.2d 921]. That such an instruction should be given but its refusal was not prejudicial under the particular circumstances shown in those cases, see *People* v. *Foster* (1926), 198 Cal. 112, 127-128 [243 P. 667]; *People* v.

*Hovermale* (1925), 76 Cal.App. 91, 99 [243 P. 878]; *People* v. *Gourdin* (1930), 108 Cal.App. 333, 335 [291 P. 701]; *People* v. *McCoy* (1932), 127 Cal.App. 195, 197, 198 [15 P.2d 543].)

The refusal of such an instruction as to alibi was upheld in *People* v. *Powell* (1927), 83 Cal.App. 62, 65-66 [256 P. 561], and *People* v. *Garvey* (1928), 93 Cal.App. 497, 504 [169 P. 702], in part because the court was of the opinion that the instruction was covered and in part because (p. 67 of 83 Cal.App.) "we see no good reason why a trial court should call attention to any particular line of testimony whether offered by the prosecution or the defense." The last quoted statement has no application to this case where, on the most important question presented to the jury, there were two "lines of testimony" in direct conflict and attention was inevitably directed to the prosecution testimony by the instruction defining robbery. (See, also, *People* v. *Dillon* (1924), 68 Cal.App. 457, 474 [229 P. 974], and *People* v. *Bedoy* (1927), 80 Cal.App. 783, 785 [252 P. 1061], holding that the refusal of an instruction specifically applying the doctrine of reasonable doubt to each element of the crime charged was not prejudicial in the circumstances; *People* v. *Fisher* (1911), 16 Cal.App. 271, 275 [116 P. 688], and *People* v. *Thal* (1923), 61 Cal.App. 48, 55 [214 P. 296], holding that the refusal of such an instruction was not error in view of the other instructions given; *People* v. *Spitzer* (1922), 57 Cal.App. 593, 598 [208 P. 181], and *People* v. *Pineda* (1940), 41 Cal.App.2d 100, 106 [106 P.2d 25], holding that the refusal to instruct as to the application of reasonable doubt to a defense was not error but commenting on the weakness of the defense.)

We are of the view that it may properly be said here, as it was in *People* v. *Wilson* (1929), *supra*, 100 Cal.App. 428, 432, "It is manifest that a vast difference might exist between an instruction by which reasonable doubt would be *defined* [as provided by Pen. Code, § 1096a] and one in which might be stated the law with reference to some fact from which the jury would be authorized to form a conclusion as to whether a reasonable doubt of the guilt of the defendant would follow.... In other words, without infringing in any manner on the provision of the statute by attempting to further *define* reasonable doubt, a defendant would still have the right to direct attention to the evidence from a consideration of which a reasonable doubt of his guilt might be engendered."

The considerations which we have reviewed lead us to the conclusions that the refusal to instruct the jury specifically and directly as requested was error and that on the record here we cannot justifiably hold that such error was not prejudicial; i.e., that defendant would have been convicted had the error not occurred. Under such circumstances the judgment cannot be sustained. (*People* v. *MacPhee* (1914), 26 Cal.App. 218, 226 [146 P. 522]; *Freeman* v. *Adams* (1923), 63 Cal.App. 225, 232, 233 [218 P. 600]; *People* v. *Irby* (1924), 67 Cal.App. 520, 530 [227 P. 920]; *People* v. *Walker* (1924), 69 Cal.App. 475, 499 [231 P. 572]; *People* v. *Degnen* (1925), 70 Cal.App. 567, 606 [234 P. 129]; *People* v. *Curtis* (1939), 36 Cal.App.2d 306, 328 [98 P.2d 228]; *People* v. *Burness* (1942), 53 Cal.App. 2d 214, 222 [127 P.2d 623]; *People* v. *Dail* (1943), 22 Cal.2d 642, 659 [140 P.2d 828]; *People* v. *Thomas* (1945), 25 Cal. 2d 880, 902 [156 P.2d 7].)

For the reasons above stated, the judgment and order appealed from are reversed.

Gibson, C. J., Carter, J., and Traynor, J., concurred.

EDMONDS, J.—I cannot agree with the conclusion of my associates that the failure of the trial court to give to the jury three instructions requested by Kane amounted to prejudicial error. Procedural error or misdirection of the jury is not a ground for the reversal of a judgment of conviction "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Const., art. VI, §4½.) Very certainly, as I read the record in this case, there has been no miscarriage of justice.

The entire defense presented by Kane turned upon his story that he took the money from Miss Echols with her consent. That was the point which was stressed in the examination of Kane and Miss Echols and in the argument of the district attorney to the jury. In instructing the jurors as to the legal principles applicable to these facts, the trial judge told them, in the language of section 211 of the Penal Code, that "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." He also declared in the form prescribed by section 1096 of the Penal Code, the law concerning the

presumption of innocence and the doctrine of reasonable doubt.

The three instructions refused and now relied upon by Kane merely stated these rules with particular reference to the evidence. The first one pointed out that in order to convict Kane, the jurors "must be convinced beyond a reasonable doubt that the property taken was against the will and without the consent of Marie H. Echols." The next one relates to the same issue but is worded in greater detail; if "there was an agreement or understanding" between Kane and Miss Echols or permission from her to take the money, it reads, then Kane is not guilty of robbery and he may not be convicted if there is a reasonable doubt as to whether such permission or consent was given. The last of the three is to the same effect, and declares that Kane is not guilty of robbery if Miss Echols "in any manner instigated and encouraged the commission of the offense."

The order of the trial judge refusing each of these instructions "except as covered by other instructions given" was, therefore, correct. It is the duty of a court in instructing a jury to cover the different aspects of the case and to make clear the general principles of law applicable to the facts shown in evidence. (*People* v. *McChesney*, 39 Cal.App. 2d 36, 39 [102 P.2d 455].) However, when the jurors have been fully informed as to the law relating to an issue, it is not error for the court to refuse to give additional instructions requested by the defendant covering the same subject. (*People* v. *Boggs*, 12 Cal.2d 27, 34 [82 P.2d 368]; *People* v. *McKenna*, 11 Cal.2d 327, 337 [79 P.2d 1065]; *People* v. *Parchen*, 37 Cal.App.2d 215, 223 [98 P.2d 1045].) And where the elements necessary to constitute the crime charged are clearly stated, the jury must be presumed to have understood that, in the absence of sufficient proof of any one of those elements, the defendant was entitled to an acquittal. (*People* v. *Griesheimer*, 176 Cal. 44, 53 [167 P. 521]; *People* v. *Scobey*, 35 Cal.App.2d 211, 213 [95 P.2d 145]; *People* v. *Ortiz*, 63 Cal. App. 662, 669 [219 P. 1024]; *People* v. *Thal*, 61 Cal.App. 48, 55 [214 P. 296]; *People* v. *Fisher*, 16 Cal.App. 271, 275 [116 P. 688].)

The majority opinion cites *People* v. *Cook*, 148 Cal. 334 [83 P. 43], in support of the proposition that Kane was prejudiced by the trial court's refusal to give the instructions requested by him. That case, decided some years be-

fore the adoption of the constitutional mandate laying down the rule to be followed by appellate courts in considering procedural errors, is of doubtful authority for still other reasons. In the first place, the instruction which it was held should have been given at the request of Cook, limited the effect of evidence tending to show motive for the homicide to that particular purpose; it was not one which emphasized an essential element of the crime charged. Moreover, the statement quoted from that case appears in the opinion of the Chief Justice, which was signed by one other member of the court. Two justices concurred in the opinion with further discussion in regard to the admissibility of the evidence upon which the instruction was based. One justice concurred only in the judgment of reversal and two others wrote separate dissenting opinions.

The quotation taken by Mr. Justice Schauer from *People* v. *Visconti*, 31 Cal.App. 169 [160 P. 410, 411], shows that the instruction which the District Court of Appeal held should have been given related to the defense of alibi, and was not, as is each of those requested by Kane, a statement in more extensive form of the law's requirement that one particular element of the crime be proved beyond a reasonable doubt. Moreover, upon denying a petition for hearing, this court expressly limited the scope of the decision. It should not be understood, the order reads, that the refusal to give the requested instruction "would in all cases be deemed by us sufficient cause for reversal. Especially is this true in view of section 4½ of article VI of the constitution." (P. 172.)

The instruction which was considered in *People* v. *Wilson*, 100 Cal.App. 428 [280 P. 137], also related to the defense of alibi. Wilson, like Kane, was accused of robbery. The presence of the perpetrator of a robbery at the scene of the wrongdoing is, of course, implied, although not expressly referred to, in the statutory definition of the crime. However, the lack of the victim's consent is by statute made an essential element of the crime and there is no sound reason for requiring that the jury's attention particularly be called to each of those elements when the crime is defined by an instruction in the language of the Penal Code.

Throughout the trial of Kane, he insisted that Miss Echols consented to his taking of the money from her. In direct contradiction to her testimony, he declared that she planned

the crime with him even to the time and place he was to meet her. Under these circumstances, and with the argument of counsel narrowing the issue to the question as to whether Miss Echols willingly and in furtherance of the common purpose gave him the money, the record abundantly shows that the case was presented to the jurors upon that one point. To me, it is inconceivable that any juror did not understand the defense relied upon by Kane; certainly any intelligent person who heard the evidence and the court's instructions would know that if Miss Echols consented to Kane's acts he could not be convicted. Accordingly, the verdict expressed the unanimous conclusion of the jurors that Kane took the money against the will of Miss Echols.

For these reasons, and also because the denial of the requested instructions, even if erroneous, did not constitute prejudicial error resulting in a miscarriage of justice, in my opinion, the judgment should be affirmed.

Shenk, J., and Spence, J., concurred.