[Crim. No. 911.   Fourth Dist.   Mar. 21, 1952.]

THE PEOPLE, Respondent, v. OTIS BLANCHARD HAYWOOD, Appellant.

Miller & Sinclair, Loren Miller and Harold J. Sinclair for Appellant.

Edmund G. Brown, Attorney General, and Dan Kaufmann, Deputy Attorney General, for Respondent.

MUSSELL, J.—Defendant was charged with, and by a jury found guilty of, the crimes of kidnapping, robbery and forcibly raping one Lola Sickler. He was sentenced to the state's prison on each of the three counts contained in the information and appeals from the judgment. Defendant admits that the evidence was amply sufficient to support the verdict and the judgment. His contentions on appeal are that the court committed prejudicial error in (1) failing to instruct the jury on the question of alibi; and (2) failing to instruct the jury as to the testimony of accomplices.

The record shows that the defendant offered an instruction on the queston of his alibi. This instruction was not given by the trial court and the principal question for our determination is whether the failure to give such an instruction constituted prejudicial error.

## Facts

On November 13, 1949, in the evening, the prosecutrix left a café, operated by defendant's mother, on Highland Avenue, in the county of San Bernardino, and, accompanied by her dog, drove westerly in an Oldsmobile coupé. After proceeding "quite a distance," she stopped her car, parked it on the shoulder of the highway, let her dog out, and was sitting on the fender of her car drinking a bottle of beer when another automobile drove up and stopped across the highway. Three colored men got out of this car, came over to the prosecutrix' car and one of them told her she was under arrest; that she had no right to drink beer on the public highway and that she would have to go with them. The prosecutrix told them that she would follow in her car and reached to turn on the ignition, when one of the men struck her on the side of the head and stunned her. She was jerked out of her car, struck on the head again and forcibly put in the back seat of the other car, where all three of the men, in turn, forcibly raped her. She "passed out" and when she regained consciousness, she heard one of the men say "What shall I do with her" and another one said "shoot her if you want to, to get rid of her." She passed out again and when she recovered consciousness, she was lying in a ditch. Her clothing was torn, her back hurt and she could hardly move because of the pain, her chest and head ached, her face and head were bleeding and her lips were cut on the inside. She succeeded in getting to her car, which was nearby, and found that the contents of her purse had been taken, including one $20 bill, three $1.00 bills, a social security card and driver's license. Her wrist watch and a cross on a gold chain were missing. The prosecutrix then drove to her home in San Bernardino and the police were called. She was then taken to a hospital and examined by a physician, who found bruises on her body and evidence of recent sexual intercourse.

The prosecutrix was unable to positively identify the defendant as one of the men who assaulted and robbed her and could not determine how long she was in the car to which she had been taken. However, she was able to identify this car as a four-door sedan, dark in color.

Defendant was arrested on November 15th by a deputy sheriff, taken to the sheriff's office in Fontana and there told that he was being arrested for what had occurred on the previous Sunday night. Defendant at this time said he wanted

to tell all that had happened; that he always found when he told the truth, it was best. Defendant then, in the presence of a shorthand reporter and another deputy sheriff freely and voluntarily stated that "it started in front of his mother's service station when a lady came by in a car"; that he and two men named Craig and Berry, followed the car west on Highland Avenue and when they approached it, Craig and Berry got out and told the lady that they were cops; that she was drunk and that they were going to "take her down"; that she told them she didn't do anything wrong but if they wanted her to go with them, she would drive her car; that they refused and told her to get out and get in their car; that Craig and Berry went to her car to get her out and called him to assist them but he would not help them because he was scared and shaking; that they finally put her in Craig's car and she told them to get her dog and purse; that he got the dog and purse, put them in the car and proceeded to drive and that they then attacked her; that two of them would hold her while one would attack her and the other two would hold her until all three of them had attacked her; that he had sexual intercourse with her and that she was screaming and crying; that a patrol car came to the scene; that he jumped out of his car and ran; that Craig took the woman away and dumped her out. No force or violence was used on the defendant or promises made to induce him to make the foregoing statement. The arresting officer's statement as to the conversation with defendant was corroborated by the testimony of another deputy sheriff and by the testimony of the shorthand reporter who took down the entire statement in shorthand at the time.

A deputy sheriff patrolling the area where the prosecutrix left her car found it parked on the shoulder of the road at approximately 11:30 p. m. on November 13, 1949, and about 30 minutes later, he observed Craig's black Buick sedan in the vicinity.

Melvin Craig, who was named in the defendant's statement to the officers, testified that he had known the defendant since 1947; that during the evening of November 13th, he was driving his Buick sedan, accompanied by one Dean Berry; that before dark they pulled into a gas station where they encountered the defendant; that the car of the prosecutrix went by and defendant told him to stop it; that they did and got out of their car masquerading as policemen; that defendant asked the lady if she had been drinking and she

said "Yes"; that Craig then said they were sorry but that they would have to take her in; that she indicated that she would follow them but he said she would have to go in his car; that defendant and Berry put her in his car; that she asked for her dog and purse and that defendant went back and got them; that defendant told him to pull off the highway a couple of blocks away; that the three men had sexual intercourse with the complaining witness and then saw the sheriff's patrol car; that he and the defendant jumped out and went to his house; that he asked appellant how much money he got and defendant replied "I got $2."

On rebuttal, the prosecution called the other accomplice, Dean Berry, who had known the defendant for three or four years, and his testimony was substantially the same as that of Craig.

At the trial the defendant took the stand in his own behalf and testified that on November 13th he went to work at his mother's restaurant at 8 o'clock in the morning. He stated that he left the restaurant at 11:30 in the evening, when Craig and Berry came to the station to get gasoline; that he drove east about one-half mile with Craig and Berry and then got out of their car; that he was taken to Riverside by a friend and there stayed until the day of his arrest. He testified that after he was taken to the sheriff's office, he was told that if he would "cop out" to rape it could be easier on him; that he was hit on the head with a rubber hose; that he still had the "printing" on his head from it and that he had X rays taken. He stated that he was knocked out and the next thing he remembered he was in the county jail. He testified to a fight with Craig and Berry in 1949 and said that after that time he did not associate with them. In addition to his own testimony, defendant introduced several other witnesses in an attempt to establish that he was at his mother's place of business during the entire day and evening of November 13, 1949. One of these witnesses, Harry Hoover, an electrician, testified that he was working at the restaurant owned by appellant's mother from 1 o'clock until shortly before 11 on November 13th; that he saw the defendant several times during the afternoon and defendant was there when he left. He stated that he could not remember at what specific times during the day he saw the defendant but that he did see him at frequent intervals during the afternoon and evening. Another witness, who was employed by defendant's mother to operate the service station adjoining the restaurant, stated that he saw

Craig at 11:30 Sunday night when he drove up and that there was another boy with him. He testified that the defendant was with him at 11:30 when he went to wait on a customer. A waitress, who worked at the café on November 13th, stated that she worked from 11 o'clock in the morning until 11:30 that night and that the defendant was there ''during working time.''

On rebuttal both Craig and Berry denied that they had ever had a fight with the defendant. The arresting officer testified that no one struck the appellant and denied any conversation with the defendant in which he stated to the defendant that it would go easier with him if he could ''cop out'' to a plea.

■ It is evident from the testimony produced in an attempt to prove an alibi that the defendant was entitled to an instruction on the subject, even though the evidence adduced may not have been of a character to inspire belief. (*People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281].) However, it does not necessarily follow that the judgment must be reversed because of the failure to give an instruction on the defense of alibi. If, under the circumstances shown by the record, it can be justifiably held that the defendant would have been convicted had the error not occurred, the judgment will not be reversed. (*People* v. *Kane,* 27 Cal.2d 693, 702 [166 P.2d 285].) As was said in *People* v. *Curtis,* 36 Cal. App.2d 306, 327-328 [98 P.2d 228] :

''With the record in the condition in which we find it, we must look into the effect of the error of the trial court in connection with the disposition of the appeal in the light of the provisions of section 4½ of article VI of our state Constitution, which forbids us to set aside any judgment or grant a new trial unless, after an examination of the entire cause, including the evidence, this court shall be of the opinion that the error complained of has resulted in a miscarriage of justice. The phrase 'miscarriage of justice', used as descriptive of that condition of a cause, has no hard and fast definition. It seems to us that where the record discloses the commission of errors at the trial the appellate court must first find that upon the record it is seriously doubtful that without such errors the defendant would have been convicted, before a reversal of the judgment is justified. (*People* v. *Adams,* 76 Cal.App. 178, 186 [244 P. 106].) As was said in *People* v. *Black,* 73 Cal. App. 13, 38 [238 P. 374] : ''It is the law that, when applying

the provisions of section 4½ of article VI of the Constitution to an entire cause, we must direct a reversal when we are unable to say 'whether appellant would or would not have been convicted but for the errors of the court'. (*People* v. *Degnen,* 70 Cal.App. 567 [234 P. 129].)'' . . . We have read the instructions given, together with the evidence, and have no hesitancy in saying that under the evidence but one verdict could be reached, and that was the one returned by the jury. Such being the case, we are without power to set it aside.''

In *People* v. *Dail,* 22 Cal.2d 642, 659 [140 P.2d 828], it is said:

''In considering the effect of article VI, section 4½ of the Constitution, 'We are not substituted for the jury. We are not to determine, as an original inquiry, the question of defendant's guilt or innocence.' (*People* v. *O'Bryan,* 165 Cal. 55, 66 [130 P. 1042]; see, also, *People* v. *Roe,* 189 Cal. 548, 561 [209 P. 560].) As stated in *Tupman* v. *Haberkern,* 208 Cal. 256, 263 [280 P. 970], 'Whether the error found to be present ''has resulted in a miscarriage of justice'' presents a question of law on the record before the court, and the purpose of the section (4½) was to require the court to declare as a matter of law whether the error has affected the substantial rights of the party complaining against it, and not for the purpose of determining the evidentiary value of the testimony or where the preponderance of the evidence lies.' ''

The sufficiency of the evidence in the instant case to sustain a convicton is not questioned. Indeed, it is so overwhelming that an instruction as to the alibi defense would not have changed the verdict returned. The jury was fully instructed as to the doctrine of reasonable doubt, the interpretation of the evidence to be adopted, and that ''the testimony in this case if its weight and effect be such as two conclusions can be reasonably drawn from it, the one favoring the defendant's innocence, and the other tending to establish his guilt, law, justice and humanity alike demand that the jury shall adopt the former, and find the accused not guilty.'' If the jury believed that there was any merit to defendant's evidence of alibi, it would have acquitted him under the instructions given by the court. Manifestly, if the jury believed that the defendant did not leave his mother's café and restaurant on the evening of November 13th, or if they had any reasonable doubt on the question, they could not possibly have concluded beyond a reasonable doubt that he committed the offenses charged.

We have read the instructions given, together with the testimony, and have concluded that under the evidence but one verdict could be reached, and that was the one returned by the jury.

In his opening brief the defendant contends that it was prejudicial error for the court to fail to instruct the jury on accomplices and the necessity for corroboration. At the time this brief was filed it appeared from the clerk's transcript that instructions on this subject had not been given by the trial judge. However, the record was subsequently augmented by order of court directing the reporter to file the instructions actually given and it appears from this supplemental record that the court gave full, fair and complete instructions on accomplices, the manner in which their testimony should be reviewed by the jury and the necessity of corroboration. The contention that the court failed to instruct the jury as to the testimony of accomplices is entirely without merit.

We are of the opinion that the failure of the trial court to give the offered instruction or other instructions on the defense of alibi under the circumstances shown by the record did not result in a miscarriage of justice and that the error did not affect the substantial rights of the defendant.

Judgment affirmed.

Barnard, P. J., and Griffin, J., concurred.