[Crim. No. 10822. Third Dist. July 22, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
EMANUEL STONE, Defendant and Appellant.

COUNSEL

Frederic M. Hanelt, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, and Robert D. Marshall, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

BLEASE, J.—This is an appeal from a judgment of conviction entered after defendant Emanuel Stone was found guilty by a jury of robbery (Pen. Code, § 211) and to have used a firearm in the commission thereof (Pen. Code, § 12022.5). Defendant's sole contention on appeal is that the trial court erred prejudicially in refusing to give the jury an instruction (CALJIC No. 2.91) relating the reliability of eyewitness testimony to the requirement of proof beyond a reasonable doubt. We agree that the refusal was error, but find it harmless.

FACTS

On September 12, 1979, at about 11:30 p.m., an individual identified as defendant entered Allen's Donut Shop in Rancho Cordova, California. He wore a dark sport jacket, white or light pants, a shoulder holster, and carried a handgun. As he entered he was attempting to pull a paper bag (in which eye holes had been cut) down over his face. As he approached the counter, however, he pushed the bag back onto the top of his head after he tripped over a chair, apparently as a result of restricted vision. He ordered the two employees present, Muriel Alex and Betty Larson, to the counter. There Alex had an opportunity to observe his face closely as she stood three feet in front of him for "[h]alf a minute, a minute" before he ordered her to lie on the floor. He directed Larson to give him the money from the cash register, which she did without looking at his face. She gave him between $50 and $100. Defendant then told Alex to open the safe, which she attempted to do while he held a gun at the back of Larson's head. Moments later, the ringing of the bell at the shop's entrance alerted Larson to the fact that defendant had fled.

David Hamilton and Patricia Anderson were passing by the donut shop in a car as defendant ran out. He was wearing white pants and a brown jacket and carrying a bag, which he dropped at some point. They followed him in the car, keeping sight of him as he ran across a field and around a pizza parlor and emerged a moment later with a companion. Hamilton and Anderson generally followed the two at a discreet distance, but had occasion to drive past them several times and were able to observe defendant's face. After defendant and his companion entered a nearby apartment, they contacted the sheriff's office.

Immediately after the robbery, just as Hamilton and Anderson began to follow defendant, two deputies arrived at the donut shop for a coffee break. One of them, Deputy Gary Lewis, saw defendant, dressed in white pants and a brownish sport coat, running across the street near the stop. When the other deputy entered the shop, Alex told him of the robbery and pointed out the paper bag which defendant had discarded in the parking lot. The deputies began to search the vicinity. A short time later they were directed to join other deputies at the apartment identified by Hamilton and Anderson.

Deputies surrounded the apartment and ordered its occupants out; 11 or 12 people emerged. Defendant and six other black males were de-

tained and placed in a lineup. Deputy Lewis recognized defendant as the person he saw running from the shop. One by one, Alex, Larson, Hamilton, and Anderson were brought to view the lineup and all but Larson positively and unequivocally identified defendant as the robber, though he had evidently changed his clothing. Larson did not positively identify anyone as she had not really seen the robber's face, but she said that the build of one of the other individuals in the lineup was like that of the robber.[1]

A pair of white pants belonging to defendant and a "wad" of currency were found on the floor in one of the bedrooms of the apartment when officers entered to make certain no one remained inside. In a subsequent seach, two handguns, two shoulder holsters and a brown sport jacket were discovered, and the two wads of money found in the apartment were discovered to consist of thirty-one $1 bills and eight $5 bills.[2] Defendant's thumb prints were subsequently found on the paper bag left at the scene of the robbery.

The defense was alibi. Defendant and a friend, Joseph Sisco, testified that they spent the evening at the Mather Field Non-Commissioned Officers Club. They testified that defendant had indeed been wearing his white pants earlier in the day, but he had borrowed some "more dressy" gray pants to go to the club before 8 p.m. that evening. Linda Sisco, defendant's "very close lady friend," also recalled that he had changed his clothes before leaving the apartment early in the evening. Larry Wright, a neighborhood acquaintance, testified that defendant was wearing the same clothes at the lineup as when he arrived at the apartment shortly before, but on cross-examination Wright stated that defendant was wearing white pants. Joseph Sisco said the revolver and holsters found in the apartment belonged to him; the other gun, a .25 caliber automatic, belonged to a guest. Defendant explained the presence of his fingerprints on the shopping bag mask found at the scene of the robbery by noting that he sometimes bought groceries for the Sisco family.

---

[1]Larson testified that she also indicated that defendant had the proper build, but the deputy who showed her the lineup recalled only her reference to the other individual.

[2]Defendant suggests that his trial counsel may have been inadequate in failing to make a motion to suppress evidence so discovered, but he concedes that in the state of the present record the proper avenue for presenting the issue is by petition for a writ of habeas corpus. (*People* v. *Pope* (1979) 23 Cal.3d 412, 416 [152 Cal.Rptr. 732, 590 P.2d 859].)

## DISCUSSION

 Defendant contends that it was error to refuse his request that CALJIC No. 2.91[3] be given to the jury.[4] The People implicitly concede this. A criminal defendant is entitled upon request to an instruction that directs the jury's attention to consideration of whether reasonable doubt is engendered by specific evidence, including identification testimony. (*People v. Hall* (1980) 28 Cal.3d 143, 159 [167 Cal.Rptr. 844, 616 P.2d 826]; *People v. Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91]; *People v. Granados* (1957) 49 Cal.2d 490, 496 [319 P.2d 346]; *People v. Roberts* (1967) 256 Cal. App.2d 488, 492-493 [64 Cal.Rptr. 70]; *People v. Guzman* (1975) 47 Cal.App.3d 380, 387 [121 Cal.Rptr. 69].) The People admit that "[t]he requirement is most obviously met by giving CALJIC 2.91 . . . . "[5] They insist, however, that the error was harmless. We agree.

The trial court gave several instructions which we think sufficiently alerted the jury to consider the relationship between the identification testimony and reasonable doubt. These were CALJIC Nos. 2.20[6] (relat-

---

[3]CALJIC No. 2.91 (4th ed. 1979) states: "The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of defendant as the person who committed the offense before you may convict him. If, from the circumstances of the identification, you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty."

[4]The instruction was originally proposed by the prosecution, which chose to withdraw it when the court expressed its view that it should not be given. The defense supported the giving of the instruction, however.

[5]The trial court expressed a belief that the proposed instruction was "inapplicable" because there was corroborative circumstantial evidence in addition to the eyewitness testimony. Despite its descriptive title ("Burden of Proving Identity Based Solely on Eye Witnesses"), CALJIC No. 2.91 is not supposed to be given only in cases where the identification of the defendant is dependent exclusively upon eyewitness testimony. Thus, while the "Use Note" accompanying the 1976 version recommended giving the instruction "where the *only* evidence of identification is the testimony of eye witnesses," the current "Use Note" recommends its use "where the evidence of identification *includes* the testimony of eye witnesses." Certainly the evidence adduced in the instant case *included* eyewitness identifications of defendant.

[6]As modified by the trial court, CALJIC No. 2.20 (4th ed. 1979) read: "Every person who testifies under oath is a witness. You are the sole judges of the believability of a witness and the weight to be given to his testimony. [¶] In determining the believability of a witness you may consider anything that has a tendency in reason to prove or

ing to the general credibility of witnesses), 2.90[7] (the presumption of innocence and reasonable doubt) and 4.50[8] (alibi), as well as a specific instruction on evaluating eyewitness testimony taken from *People v. Guzman, supra*, 47 Cal.App.3d 380.[9]

The giving of CALJIC No. 4.50 based on defendant's reliance upon an alibi defense is especially significant, since that instruction in essence puts to the jury the issue of identity stated in terms of the defendant's *presence*. Thus, in *People v. Gomez* (1972) 24 Cal.App.3d 486, 490 [100 Cal.Rptr. 896], a case the court described as "close" in light of the

---

disprove the truthfulness of his testimony, including but not limited to any of the following: [¶] The extent of his opportunity and ability to see or hear (or otherwise become aware of); to remember or to communicate any matter about which he testifies; [¶] The character and quality of his testimony; [¶] The demeanor of the witness while testifying and the manner in which he testifies; [¶] The existence or nonexistence of a bias, interest, or other motive; [¶] (A statement previously made by him that is (consistent) (or) (inconsistent) with his testimony); [¶] Evidence of the existence or nonexistence of any fact testified to by him; [¶] His attitude toward the action in which he testifies or toward the giving of testimony; [¶] (His admission of untruthfulness;)"

[7]CALJIC No. 2.90 (4th ed. 1979) states: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

[8]CALJIC No. 4.50 (4th ed. 1979) reads: "The defendant in this case has introduced evidence for the purpose of showing that he was not present at the time and place of the commission of the alleged offense for which he is here on trial. If, after a consideration of all the evidence, you have a reasonable doubt that the defendant was present at the time the crime was committed, he is entitled to an acquittal."

[9]The instruction based on *Guzman* was as follows: "Identification testimony is an expression of belief or impression by a witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later. [¶] In appraising the identification testimony of a witness, you should consider the following: [¶] 1. Did the witness have the capacity and an adequate opportunity to observe the offender? [¶] 2. Did the witness know, or had he seen, or had personal contact with the offender before the occurrence of the crime? [¶] 3. Was the identification made by the witness after the offense the product of his own recollection? [¶] 4. The length of time that lapsed between the occurrence of the crime and the identification. [¶] 5. Any occasions where the witness failed to make an identification of the defendant or made an identification that was inconsistent with his identification at trial. [¶] 6. Was the witness positive in his identification? [¶] 7. Did the testimony as to identification remain positive and unqualified after cross-examination? [¶] The credibility of each identification witness is to be considered by the same criteria as are applicable to the testimony of any other witness."

fact that the identification testimony was "without any substantial corroboration," the failure to give CALJIC No. 2.91 was held to be harmless because the defense was alibi and the jury was instructed in accordance with CALJIC No. 4.50. (*Id.*, at p. 490; accord *People v. Guzman, supra*, 47 Cal.App.3d at p. 388 [error would have been harmless except for occurrence of other errors]; *People v. Ware* (1978) 78 Cal.App.3d 822, 842-843 [144 Cal.Rptr. 354]; *People v. Guillebeau* (1980) 107 Cal.App.3d 531, 545 [166 Cal.Rptr. 45].) We find this unquestioned line of cases persuasive and precisely apposite. We note, moreover, that the *Guzman* instruction on the reliability of eyewitness testimony immediately preceded the giving of CALJIC No. 2.90, the instruction on reasonable doubt. We cannot say in this case that the giving of CALJIC No. 2.91 "would have added anything material to the jury's understanding of its duty." (*People v. Gomez, supra*, 24 Cal. App.3d at p. 490.)

Even apart from the foregoing, it is difficult for us to imagine how the instructional error could have prejudiced him. Despite his attempt to so characterize it, this was not at all a "close case." In *People v. Roberts, supra*, 256 Cal.App.2d 488, cited by defendant, the reliability of the eyewitness identifications was questionable (defendant was seen through a peephole in a public restroom under "fair" lighting conditions) and entirely uncorroborated. (*Id.*, at p. 491.) Here, in contrast, four witnesses unqualifiedly identified defendant from a lineup within about a half-hour after the robbery. One of them, Muriel Alex, had been able to observe his face from three feet away for up to a minute inside the donut shop. (See *People v. Guillebeau, supra*, 107 Cal.App. 3d at pp. 545-546.) There was also abundant corroborative evidence presented. The presence of the handguns and holsters, the "wads" of small bills and the brown jacket (which defendant demonstrated did not fit him well) and white pants (which defendant admitted were his) in the apartment, combined with the discovery of defendant's fingerprints on the paper bag left at the scene of the robbery, all point accusingly at defendant. *At the very least* they indicate that *someone* in the lineup observed by all the witnesses was the robber. Four of the five had no difficulty at all pointing out who it was and the fifth simply could not identify anyone.

The judgment is affirmed.

Carr, J., concurred.

**PARAS, Acting P. J.**—In the result and in the majority's reasoning which reaches that result, I concur. I write separately only to criticize the unnecessary and in my view mischievous rule of law which generated[1] this appeal in the first place. The Supreme Court decrees and we dutifully obey. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) But as stated by our finest and most quotable authority, we are "bound but not gagged." (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 665, p. 4579.)

My quarrel is with the now well established rule which requires a judge in a criminal trial to give "an instruction that directs the jury's attention to consideration of whether reasonable doubt is engendered by specific evidence, including identification testimony." (Majority opn., p. 835.)

What is it about our criminals and their crimes that so enchants and preoccupies the members of this state's highest tribunal that they feel compelled to formulate and propound procedural rules making it ever more difficult either to convict at all or to convict of the crimes actually committed rather than of lesser crimes? How did we go from a clear and unambiguous 1927 statement of the Legislature that after defining presumption of innocence and reasonable doubt nothing more need be told a jury on the subject, to a rule *mandating* the trial judge to comment favorably (in effect) on each item of evidence the defendant selects?

Penal Code section 1096a provides and has provided since 1927 that: "In charging a jury, the court may read to the jury section 1096 [presumption of innocence and definition of reasonable doubt] of this Code, *and no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given.*" (Italics added.) There is nothing unclear about this direction. It unequivocally enunciates the total entitlement of a defendant on the point, without however negating the trial court's power in a proper case to amplify as needed.

---

[1] The use of the word "generated" is probably inaccurate, for even though instructional error is the sole issue raised on appeal, another doubtless would have been found. Today, thanks to the ridiculous rules 250 and 251, California Rules of Court, it is unimaginable that a convicted criminal will not appeal. They all do (as defense counsel idly sits by, unable because of these rules ever to perform his traditional ethical duty of counseling against meritless litigation, including criminal appeals), and always with assertedly sound reasons for reversal. One is led to believe, after continually reading and hearing such arguments in thousands of cases, that the vast amount of crime which plagues us daily is committed by no one. All seem to be innocent.

This is consistent with the civil law which insists upon an absence of repetition (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 209, p. 3027), argumentation (*id.*, § 211, p. 3028), or formulization (*id.*, § 212, p. 3029). The object of course is judicial neutrality, leaving the jury both uninfluenced by the court and unconfused by needless verbiage.

The first word from our Supreme Court regarding section 1096a after 1927 came in *People* v. *Kane* (1946) 27 Cal.2d 693 [166 P.2d 285], a four-to-three decision in which the majority ignored the section and reversed a robbery conviction for failure to instruct on the relationship of specific evidence to reasonable doubt. To the claim that the issue was fully covered by the section 1096 instruction, the majority resurrected *People* v. *Cook* (1905) 148 Cal. 334 [83 P. 43], an ancient and wholly inappropriate authority both as pointed out by the *Kane* dissent (27 Cal.2d at pp. 703-704) and as revealed by a careful reading and study of its (*Cook's*) facts and procedural setting. Our Supreme Court next spoke on the matter in *People* v. *Granados* (1957) 49 Cal.2d 490 [319 P.2d 346], again by four to three. This time, in a complete non sequitur (although the proposed instruction there as an abstract proposition was in my opinion a proper one and not of the type I here condemn) the majority said: "Section 1096a of the Penal Code declares that when the statutory definition of reasonable doubt is given (see Pen. Code, § 1096), no other instruction need be given defining reasonable doubt. *Despite this section*, a defendant, upon proper request therefor, has a right to an instruction that directs attention to evidence from a consideration of which a reasonable doubt of his guilt could be engendered. (*People* v. *Kane*, 27 Cal.2d 693, 699 [3] et seq. [166 P.2d 285]; *People* v. *Wilson*, 100 Cal.App. 428, 431 [2] [280 P. 137]; *People* v. *Plywood Mfrs. of Calif.*, 137 Cal.App.2d Supp. 859, 872 [291 P.2d 587].)" (Fns. omitted. Italics added.) (49 Cal.2d at p. 496.) Why "despite this section?"

Since *People* v. *Granados, supra,* the rule has not been questioned (see *People* v. *Hall* (1980) 28 Cal.3d 143, 159 [167 Cal.Rptr. 844, 616 P.2d 826]; *People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91]), section 1096a has been forgotten, and a trial judge now sits as a tool of the defendant and importunes the jury with directions to acquit if reasonable doubt is engendered by evidence A, evidence B, C, D, etc. But where is the corollary, something like a direction that if evidence X or Y or Z convinces beyond a reasonable doubt and nothing else engenders such a doubt there should be a con-

viction? There is no corollary. There is no emphasis for the prosecution.[2] While aggressive defense counsel presents every conceivable "formula instruction," the People's counsel in this regard is relegated to the role of a prosecutorial eunuch. If fairness is what we want, if truth is what we seek, either both sides should receive desirable judicial emphasis or neither.

I certainly do not disagree with proper amplification to avoid confusion in specific situations. For example I heartily endorse an absolute requirement (subject to the harmless error rule) that in every case in which self defense is plausibly raised the *Sanchez* instruction (*People* v. *Sanchez* (1947) 30 Cal.2d 560, 571-572 [184 Cal.Rptr. 673]) should be given, for it eliminates the potential confusion occasioned by burden of proof considerations. I simply cannot abide an inflexible requirement for instructions which amount to judicial polemics for one side of a case.[3] It is my hope that the Supreme Court will soon reconsider and reject its existing pronouncements on this subject.

---

[2] Not even former CALJIC No. 22 (rev.) is permissible (see *People* v. *Brigham* (1979) 25 Cal.3d 283 [157 Cal.Rptr. 905, 599 P.2d 100]), which my personal experience as a trial judge showed to be most helpful in clarifying an inherently confusing section 1096 definition. (Cf. *People* v. *Brigham, supra,* 25 Cal.3d at p. 292 et seq.—Mosk conc. opn.)

[3] The same goes for CALJIC Nos. 2.01 and 2.02. They are nothing more than reiterations of section 1096, with a defense flavor. CALJIC No. 2.00 is not at all confusing and should be given alone.